**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| LAUREN TERKEL; PINEYWOODS ARCADIA HOME TEAM, LTD; LUFKIN CREEKSIDE APARTMENTS, LTD; LUFKIN CREEKSIDE APARTMENTS II, LTD; LAKERIDGE APARTMENTS, LTD; WEATHERFORD MEADOW VISTA APARTMENTS, LP; and MACDONALD PROPERTY MANAGEMENT, LLC; | § § § § § § § § § | |
| *Plaintiffs,* | § § | CIVIL ACTION NO. _____ |
| v. | § § § | JUDGE _____ |
| CENTERS FOR DISEASE CONTROL AND PREVENTION; ROBERT R. REDFIELD, in his official capacity as Director of the Centers for Disease Control and Prevention; NINA WITKOFSKY, in her official capacity as Acting Chief of Staff for the Centers for Disease Control and Prevention; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ALEX AZAR, in his official capacity as Secretary of the Department of Health and Human Services; | § § § § § § § § § § § § § § § § § | |
| *Defendants.* | § | |

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Lauren Terkel, Pineywoods Arcadia Home Team, Ltd. ("Pineywoods"), Lufkin Creekside Apartments, Ltd. ("Creekside"), Lufkin Creekside Apartments II, Ltd. ("Creekside II"), Lakeridge Apartments, Ltd. ("Lakeridge"), Weatherford Meadow Vista Apartments, Ltd. ("Meadow Vista"), and MacDonald Property Management, LLC ("MacDonald") (collectively, the "Plaintiffs") seek

declaratory and injunctive relief from this Court against the Centers for Disease Control and Prevention (the "CDC"), Robert R. Redfield (in his official capacity as Director of the CDC), Nina Witkofsky (in her official capacity as Acting Chief of Staff for the CDC), United States Department of Health and Human Services ("HHS"), and Alex Azar (in his official capacity as Secretary of HHS) (collectively, the "Defendants"). Plaintiffs are challenging the constitutionality of Defendants' emergency agency order imposing a moratorium on residential evictions (the "Eviction Moratorium Order" or the "Order"),[1] and in support would show the Court as follows:

As set forth in the accompanying Memorandum in Support, Plaintiffs have met their burden of showing that a preliminary injunction should issue:

*First*, they have established a likelihood of success on the merits that the Eviction Moratorium Order exceeds the powers of the federal government and violates the Administrative Procedure Act.

*Second*, Plaintiffs will suffer numerous irreparable harms absent an injunction. The evidence submitted with the accompanying Memorandum in Support demonstrates that the Eviction Moratorium Order causes substantial and irreparable harm to Plaintiffs because of its burdensome compliance costs, the requirement for them to spend money for which there is no avenue for later recovery due to sovereign immunity, and the infringement of their constitutional rights.

---

[1]    *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 85 Fed. Reg. 55292 (Sept. 4, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-09-04/pdf/2020-19654.pdf.

*Third*, the threatened injury to Plaintiffs outweighs whatever damage the proposed injunction may cause Defendants; the balance of the equities and the public interest strongly favor an injunction. Defendants lack a legitimate interest in enforcing an unconstitutional act, and the harm to Plaintiffs is substantial.

For these reasons and those set forth in detail in the accompanying Memorandum in Support, the Court should issue a preliminary injunction enjoining Defendants from enforcing the Eviction Moratorium Order.

Respectfully Submitted,

*/s/ Robert Henneke*
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
RYAN D. WALTERS
Texas Bar No. 24105085
rwalters@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, TX 78701
Telephone:    (512) 472-2700
Facsimile:    (512) 472-2728


KIMBERLY S. HERMANN
(*pro hac vice* pending)
Georgia Bar No. 646473
khermann@southeasternlegal.org
CELIA HOWARD O'LEARY
(*pro hac vice* pending)
Georgia Bar No. 747472
coleary@southeasternlegal.org
SOUTHEASTERN LEGAL FOUNDATION
560 West Crossville Rd., Ste. 104

Roswell, GA 30075
Telephone: (770) 977-2131

**Attorneys for Plaintiffs**

## CERTIFICATE OF CONFERENCE

Because Defendants' counsel has yet to make an appearance, I have not been able to confer specifically on this Motion for Preliminary Injunction. I certify that on October 21, 2020, I attempted to confer via email with counsel for Defendants HHS General Counsel Robert Charrow (robert.charrow@hhs.gov) and DOJ attorney Leslie Vigen (leslie.vigen@usdoj.gov) about the relief sought in the attached Motion for Preliminary Injunction. Defendants did not take a position in agreement or opposition.

*/s/Robert Henneke*
ROBERT HENNEKE

## CERTIFICATE OF SERVICE

I certify that the foregoing document was electronically filed on October 22, 2020, and sent via certified mail, return receipt requested on October 23, 2020, to:

Centers for Disease Control and Prevention
1600 Clifton Road
Atlanta, GA 30329

Director Robert R. Redfield
Centers for Disease Control and Prevention
1600 Clifton Road
Atlanta, GA 30329

Acting Chief of Staff Nina Witkofsky
Centers for Disease Control and Prevention
1600 Clifton Road
Atlanta, GA 30329

U.S. Dept. of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201

Secretary Alex Azar
U.S. Department of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201

U.S. Department of Justice
Civil Process Clerk
950 Pennsylvania Ave., SW
Washington, DC 20530

Stephen J. Cox
U.S. Attorney for the Eastern District of Texas
110 North College, Suite 700
Tyler, TX 75702

*/s/ Robert Henneke*
ROBERT HENNEKE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| LAUREN TERKEL; PINEYWOODS ARCADIA HOME TEAM, LTD; LUFKIN CREEKSIDE APARTMENTS, LTD; LUFKIN CREEKSIDE APARTMENTS II, LTD; LAKERIDGE APARTMENTS, LTD; WEATHERFORD MEADOW VISTA APARTMENTS, LP; and MACDONALD PROPERTY MANAGEMENT, LLC; | § § § § § § § § § | |
| *Plaintiffs,* | § § | CIVIL ACTION NO. _____ |
| v. | § § | JUDGE _____ |
| CENTERS FOR DISEASE CONTROL AND PREVENTION; ROBERT R. REDFIELD, in his official capacity as Director of the Centers for Disease Control and Prevention; NINA WITKOFSKY, in her official capacity as Acting Chief of Staff for the Centers for Disease Control and Prevention; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ALEX AZAR, in his official capacity as Secretary of the Department of Health and Human Services; | § § § § § § § § § § § § § § § § | |
| *Defendants.* | | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iv

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

STANDARD FOR GRANTING THE MOTION ........................................................ 8

ARGUMENT ............................................................................................................ 8

I.  Plaintiffs Are Likely to Succeed on the Merits ................................................. 8

    A. The Eviction Moratorium Order cannot be justified under the
    Commerce Clause ......................................................................................... 10

    B. The Eviction Moratorium Order is neither necessary to, nor
    proper for, the exercise of an enumerated power ......................................... 12

        1. The Eviction Moratorium Order is not plainly adapted to the
        regulation of interstate commerce ......................................................... 13

            a. The Eviction Moratorium Order does not regulate
            economic activity .............................................................................. 13

            b. The Eviction Moratorium Order does not contain any
            jurisdictional element that would limit its reach to only
            those evictions affecting interstate commerce ................................. 16

            c. The Eviction Moratorium Order contains no findings
            suggesting that it is essential to a broader economic
            regulatory scheme ........................................................................... 17

            d. The limited findings on evictions do not show substantial
            effects on interstate commerce ........................................................ 18

            e. Any connection between the Order and interstate
            commerce is too tenuous .................................................................. 19

        2. Even if the Eviction Moratorium Order were found to be
        Necessary, it is not Proper ...................................................................... 22

II. Plaintiffs Are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief ................................................................................ 24

III. The Threatened Injury to Plaintiffs Outweighs Whatever Damage a Preliminary Injunction May Cause Defendants ................................ 28

IV. An Injunction of this Unconstitutional Action Will Serve the Public Interest ......................................................................................... 29

CONCLUSION .................................................................................. 29

CERTIFICATE OF SERVICE ............................................................ 31

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Aspen Tech., Inc. v. M3 Tech., Inc.,*
  569 Fed. Appx. 259 (5th Cir. 2014) ..................................................................... 26

*Ass'n of Taxicab Operators, USA v. City of Dall.,*
  760 F.Supp.2d 693 (N.D. Tex. 2010) ..................................................................... 9

*Awad v. Ziriax,*
  670 F.3d 1111 (10th Cir. 2012) ..................................................................... 28, 29

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ..................................................................... 26

*California v. Trump,*
  267 F.Supp.3d 1119 (N.D. Cal. 2017) ..................................................................... 28

*Canal Aut. of the State of Fla. v. Callaway,*
  489 F.2d 567 (5th Cir. 1974) ..................................................................... 8

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,*
  511 F.3d 535 (6th Cir. 2007) ..................................................................... 9, 10, 23

*Cho v. Itco, Inc.,*
  782 F.Supp. 1183 (E.D. Tex. 1991) ..................................................................... 9

*Coalition for Economic Equity v. Wilson,*
  122 F.3d 692 (9th Cir. 1997) ..................................................................... 28

*Deerfield Med. Ctr. v. Deerfield Beach,*
  661 F.2d 328 (5th Cir. 1981) ..................................................................... 25

*Dennis Melancon, Inc. v. City of New Orleans,*
  703 F.3d 262 (5th Cir. 2012) ..................................................................... 25

*Dialysis Patient Citizens v. Burwell,*
  No. 4:17-CV-16, 2017 U.S. Dist. LEXIS 10145
  (E.D. Tex. Jan. 25, 2017) ..................................................................... 8

*Dolan v. City of Tigard,*
  512 U.S. 374 (1994) ..................................................................... 27

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
762 F.2d 464 (5th Cir. 1985) ............................................................ 25

*Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Ed. & Welfare,*
601 F.2d 199 (5th Cir. 1979) .............................................................. 8

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
561 U.S. 477 (2010) ........................................................................ 23

*GDF Realty Invs., Ltd. v. Norton,*
326 F.3d 622 (5th Cir. 2003) ................................................ 14, 15, 16

*Gonzales v. Raich,*
545 U.S. 1 (2005) ......................................... 10, 11, 12, 13, 17, 18, 22

*Groome Res., Ltd. v. Par. of Jefferson,*
234 F.3d 192 (5th Cir. 2000) ................................................. 13, 15, 17

*Gustafson v Springfield, Inc.,*
2020 PA Super 239 (2020) ......................................................... 15, 16

*Harris v. Cantu,*
81 F.Supp.3d 566 (S.D. Tex. 2015),
*rev'd sub nom., Harris v. Hahn,* 827 F.3d 359 (5th Cir. 2016) ......................... 26

*Hess v. Port Aut. Trans-Hudson Corp.,*
513 U.S. 30 (1994) ........................................................................ 23

*Jackson Women's Health Org. v. Currier,*
760 F.3d 448 (5th Cir. 2014) ........................................................... 28

*Korte v. Sebelius,*
735 F.3d 654 (7th Cir. 2013) .............................................................. 8

*Lakedreams v. Taylor,*
932 F.2d 1103 (5th Cir. 1991) ............................................................ 9

*McCulloch v. Maryland,*
17 U.S. 316 (1819) .................................................................... 12, 22

*Modoc Lassen Indian Hous. Auth. v. United States HUD,*
881 F.3d 1181 (10th Cir. 2017) ........................................................ 26

*New York v United States,*
    505 U.S. 144 (1992) ............................................................... 22

*N.Y. Progress & Protection PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) ............................................. 29

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) ........................................ 9, 11, 12, 13, 22, 24

*Paulsson Geophysical Servs., Inc. v. Sigmar,*
    529 F.3d 303 (5th Cir. 2008) ......................................... 25

*People for the Ethical Treatment of Prop. Owners v. United States Fish*
    *& Wildlife Serv.,* 852 F.3d 990 (10th Cir. 2017)................................. 11

*Printz v. United States,*
    521 U.S. 898 (1997) ............................................................... 22

*Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.,*
    621 F.2d 683 (5th Cir. 1980) .......................................... 9

*State v. United States,*
    336 F.Supp.3d 664 (N.D. Tex. 2018) .............................. 26

*Teladoc, Inc. v. Tex. Med. Bd.,*
    112 F.Supp.3d 529 (W.D. 2015) .............................. 26, 27

*Texas v. United States,*
    945 F.3d 355 (5th Cir. 2019) ....................................... 12

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) .................................................. 25, 26

*United States v. Anderson,*
    771 F.3d 1064 (8th Cir. 2014) ...................................... 11

*United States v. Guzman,*
    591 F.3d 83 (2d Cir. 2010) ............................................ 11

*United States v. Lopez,*
    514 U.S. 549 (1995) ............................................................... 10

*United States v. Morrison,*
    529 U.S. 598 (2000) ............................................................... 13

*United States v. Sullivan,*
    451 F.3d 884 (D.C. Cir. 2006) ........................................................ 11

*United States v. Whaley,*
    577 F.3d 254 (5th Cir. 2009) ........................................................ 11

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ........................................................................ 9

*VanHorne's Lessee v. Dorrance,*
    2 U.S. 304 (1795) ......................................................................... 29

*Wickard v. Filburn,*
    317 U.S. 111 (1942) ..................................................................... 17

## Constitutional Provisions:

U.S. Const. art. I, § 8 ............................................................... 10, 12

## Other Authorities:

85 Fed. Reg. 55292 (Sept. 4, 2020) ............................ 1, 2, 3, 4, 11, 16, 18

11A C. Wright, A. Miller, & Mary Kay Kane,
    *Federal Practice and Procedure*, § 2948.1 at 161 (2d ed. 1995) ...................... 25

**INTRODUCTION**

This case involves a constitutional challenge to the recent order of the Center for Disease Control ("CDC") preventing residential evictions (the "Eviction Moratorium Order" or the "Order").[2] Under the Eviction Moratorium Order, it is a federal crime punishable by up to $250,000 and a year in prison for a person to remove certain individuals unlawfully present on the property for non-payment of rent or to cause the removal of such an individual by invoking state legal proceedings. If the property owner is an organization, violations are punishable with a fine of up to $500,000 per violation.

The CDC claims that this federal invasion of private property rights and interference with state legal proceedings is justified under the Commerce Clause. But such a broad reading of the commerce power is precluded by the United States Constitution, United States Supreme Court precedent, and is inconsistent with concepts of federalism at the core of our constitutional republic.

If not enjoined, this unprecedented federal overreach will cause irreparable harm to Plaintiffs, who own residential properties subject to the Eviction Moratorium Order. As of this filing, Plaintiffs have already been denied their right to remove individuals unlawfully present on their property solely due to the operation of the Eviction Moratorium Order. *See, e.g.*, Declaration of Lauren Terkel, ¶¶ 9-10. Plaintiffs believe the number of individuals who will be permitted to remain

---

[2]     *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 85 Fed. Reg. 55292 (Sept. 4, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-09-04/pdf/2020-19654.pdf.

unlawfully present on their property due to the Eviction Moratorium Order will only continue to grow over time. *Id*. at ¶ 17. This interference with Plaintiffs' property rights and legal remedies under state law not only violates the Constitution, but results in a ripple effect on Plaintiffs' ability to manage their properties, provide services to paying renters, pay utilities, pay staff, and pay their mortgages. Declaration of Lauren Terkel, ¶¶ 12, 15; Declaration of Carol C. Moore, ¶¶ 20-22; Declaration of Jerry D. Moore, ¶¶ 19-21; Declaration of Justin MacDonald, ¶¶ 6-8, 22-23. These injuries will be unrecoverable. Declaration of Carol C. Moore, ¶ 19; Declaration of Jerry D. Moore, ¶ 18; Declaration of Justin MacDonald, ¶ 11. Accordingly, a preliminary injunction is necessary to prevent further irreparable injuries while the merits of Plaintiffs' constitutional claims are adjudicated.

## FACTUAL BACKGROUND

### *Background*

COVID-19 is a respiratory disease caused by a novel coronavirus, SARS–COV–2. 85 Fed. Reg. 55292. On September 4, 2020, the CDC enacted the Eviction Moratorium Order entitled "*Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 85 Fed. Reg. 55292.[3] The Eviction Moratorium Order is the first of its kind.

While the Order is allegedly designed to prevent the interstate spread of COVID-19, it does nothing to directly address the interstate spread of that disease.

---

[3]     *Available at* https://www.govinfo.gov/content/pkg/FR-2020-09-04/pdf/2020-19654.pdf

Instead, the Order focuses solely on the eviction rights of local property owners.

Under the Eviction Moratorium Order, it is unlawful for "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action" to "evict any covered person from any residential property" in any covered jurisdiction. 85 Fed. Reg. 55296.

"Evict" is defined broadly enough to include the actual removal of the unlawfully present person from the property as well as the invocation of state legal proceedings to accomplish that end. *Id.* at 55293. In particular, "'Evict' and 'Eviction' means any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or a possessory action, to remove or cause the removal of a covered person from a residential property." *Id.*

The term "covered person" is not limited to individuals who have contracted or have been exposed to COVID-19, or those that may relocate across state lines. *Id.* Instead, "covered person" refers to any individual who submits a declaration that includes the following five qualifications:

> (1) The individual has used best efforts to obtain all available government assistance for rent or housing;
>
> (2) The individual either (i) expects to earn no more than $99,000 in annual income for Calendar Year 2020 (or no more than $198,000 if filing a joint tax return), (ii) was not required to report any income in 2019 to the U.S. Internal Revenue Service, or (iii) received an Economic Impact Payment (stimulus check) pursuant to Section 2201 of the CARES Act;
>
> (3) the individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses;
>
> (4) the individual is using best efforts to make timely partial

payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses; and

(5) eviction would likely render the individual homeless—or force the individual to move into and live in close quarters in a new congregate or shared living setting—because the individual has no other available housing options.

*Id.* at 55293. The Order includes an attachment with model language for the required declaration. *Id.* at 55297.

If a property owner attempts to remove any covered person from their property for the non-payment of rent, either individually, or by invoking eviction proceedings in state court, he could be charged and convicted of a federal crime punishable by up to $250,000 and a year in prison for individual property owners and up to $500,000 for corporate property owners. *Id.* at 55296.

The Eviction Moratorium Order states that the "Order has no effect on the contractual obligations of renters to pay rent and shall not preclude charging or collecting fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract." 85 Fed. Reg. 55296. The sole effect of the Order is to prevent owners from removing covered persons who are unlawfully present from the owner's private property.

### Plaintiffs' Injuries

Plaintiffs each own property with residents that are eligible to invoke the Eviction Moratorium Order's protections. However, beyond that, the circumstances of Plaintiffs vary.

Lauren Terkel owns a single-family home in Tyler, Texas that has been

modified into a four-plex. Declaration of Lauren Terkel, ¶ 3. She inherited the home from her father when he passed away in 2019, *id*. at ¶ 2, and has worked to upgrade and maintain the property to attract renters, *id*. at ¶ 4.

Three of Ms. Terkel's units are currently occupied by paying tenants. Id. at ¶ 5. The fourth unit is occupied by a tenant that has not paid rent in more than two months. *Id*. at ¶ 6. Despite this non-payment, Ms. Terkel must still cover property taxes, as well as other expenses like utilities, in order to maintain the property. *Id*. at ¶¶ 12, 15.

After multiple attempts to reach a resolution with the non-paying tenant, Ms. Terkel was forced to initiate eviction proceedings in the Justice of the Peace No. 1 court for Smith County in order to have the non-paying tenant removed. *Id*. at ¶ 7. During those proceedings, the tenant produced the declaration required by the Eviction Moratorium Order. *Id*. at ¶ 8. Based only on this declaration and the Order itself, the judge ordered that the non-paying tenant be permitted to remain on Ms. Terkel's property, despite his failure to pay rent, for at least an additional three months, in accordance with the date the Eviction Moratorium Order is currently set to expire. *Id*. at ¶¶ 9-10. But for the Order, Ms. Terkel would have exercised her legal right to remove the non-paying tenant from her property. *Id*. at ¶ 16.

Plaintiffs Pineywoods, Creekside and Creekside II, and Lakeridge are Texas limited partnerships that own multifamily properties in the Texas cities of Center, Lufkin, and Texarkana, respectively. Declaration of Carol C. Moore, ¶¶ 4, 6, 10, 12; Declaration of Jerry D. Moore, ¶¶ 4, 6, 10, 12. These multi-family properties are Low-

Income Housing Tax Credit properties that requires all residents to pass income eligibility requirements as part of the initial rental application process. Declaration of Carol C. Moore, ¶¶ 7, 13; Declaration of Jerry D. Moore, ¶¶ 7, 13.

Multiple tenants at these properties are delinquent on their rent, and some of those tenants that are delinquent on their rent have presented declarations that appear to substantially conform to those described in the Eviction Moratorium Order. Declaration of Carol C. Moore, ¶¶ 14-16; Declaration of Jerry D. Moore, ¶¶ 14-15. Were it not for being presented with the declaration(s) referenced above, these Plaintiffs would seek to utilize the procedures set forth in the Texas Property Code to evict those tenants that are delinquent on their rent. Declaration of Carol C. Moore, ¶ 17; Declaration of Jerry D. Moore, ¶ 16.

Plaintiff Meadow Vista is a Texas limited partnership that owns a multifamily rental property in Weatherford, Texas. Declaration of Justin MacDonald, ¶¶ 3, 5. Meadow Vista depends on monthly rent payments from its tenants to meet its financial obligations, including payment on its mortgage for the property. *Id.* at ¶ 8. Were renters to fail to pay their rent in numbers sufficient to result in a default on Meadow Vista's mortgage, the resulting foreclosure would have monumental negative effects on the company's ability to build low income housing in the future. *Id.* at ¶¶ 9, 13.

Additionally, Meadow Vista is a Low-Income Housing Tax Credit property that requires all residents to pass income eligibility requirements as part of the initial rental application process. *Id.* at ¶ 10. Because Meadow Vista's tenants are low

income, any tenants that fail to pay their rent when it is due will likely be judgment proof in the future, making recovery of any unpaid rent unlikely. *Id.* at ¶ 11.

Plaintiff MacDonald is a Texas limited liability company that manages 41 rental properties across the state of Texas. *Id.* at ¶¶ 13, 16. Many of those properties have tenants that are delinquent on their rent but have submitted declarations pursuant to the Eviction Moratorium Order. *Id.* at ¶¶ 17-18. MacDonald receives a percentage of revenue from each property it manages, and that revenue is directly tied to rental receipts. *Id.* at ¶ 20. Thus, the reduction in rents collected without any reduction in monthly expenditures required has materially harmed MacDonald's financial interests. *Id.* at ¶¶ 21-23. If not for the Eviction Moratorium Order, MacDonald would be able to prevent such harm by evicting those tenants that are delinquent on their rent on behalf of the properties it manages. *Id.* at ¶ 24.

Despite being forced to maintain non-paying tenants on their properties, Plaintiffs must continue to pay property taxes, maintain the properties, pay staff, and provide services and utilities to other renters. Declaration of Lauren Terkel, ¶¶ 12, 15; Declaration of Justin MacDonald, ¶¶ 6, 8, 22-23. Moreover, Plaintiffs have mortgages on their rental properties and rely on monthly rental income to timely make the mortgages payments on their respective properties. Declaration of Carol C. Moore, ¶¶ 20-22; Declaration of Jerry D. Moore, ¶¶ 19-21; Declaration of Justin MacDonald, ¶ 7.

Were any of Plaintiffs to default on their mortgage obligations, the resulting foreclosure on that company's mortgaged property would irreparably harm the

company. Declaration of Carol C. Moore, ¶ 23; Declaration of Jerry D. Moore, ¶ 22; Declaration of Justin MacDonald, ¶ 9. Among other things, foreclosure would also constitute a non-compliance event as well as a reportable event to the Internal Revenue Service, likely negatively affecting each entity's ability to build Low-Income Housing Tax Credit properties in the future. Declaration of Carol C. Moore, ¶ 24; Declaration of Jerry D. Moore, ¶ 23; Declaration of Justin MacDonald, ¶ 13.

## STANDARD FOR GRANTING THE MOTION

A plaintiff seeking a preliminary injunction must make four showings: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) granting the injunction is not adverse to the public interest. *Dialysis Patient Citizens v. Burwell*, No. 4:17-CV-16, 2017 U.S. Dist. LEXIS 10145 at *6 (E.D. Tex. Jan. 25, 2017) (citing *Canal Aut. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)). The Court may employ a "sliding scale" approach, issuing the injunction upon a lesser showing of harm when the likelihood of success on the merits is especially high. *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979); *see also Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits.

The Eviction Moratorium Order is ostensibly designed to prevent the spread of

disease. But the CDC, as an agency of the federal government, lacks any stand-alone power to prevent the spread of disease. The federal government "is acknowledged by all to be one of enumerated powers," *NFIB v. Sebelius*, 567 U.S. 519, 534 (2012), and thus lacks the general police power over health and safety concerns possessed by the states. *Id.* Accordingly, a federal agency may act to stem the spread of disease only to the extent that it does so in furtherance of some enumerated power. *See id.* at 535.

The first factor, "a showing of a substantial likelihood of success on the merits, does not require that the movant prove his case." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n.11 (5th Cir. 1991). The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Given this "limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* As such, "[e]ven some likelihood of success can be enough to support the issuance of a preliminary injunction." *Ass'n of Taxicab Operators, USA v. City of Dall.*, 760 F.Supp.2d 693, 696 (N.D. Tex. 2010) (citing, *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)). A preliminary injunction is permissible if "the movant has raised questions going to the merits so serious, substantial, and doubtful as to make them fair ground for litigation and thus for more deliberate investigation." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007); *Cho v. Itco, Inc.*, 782 F.Supp. 1183,

1185 (E.D. Tex. 1991). That standard is met here.

Any power that the CDC possesses to stem the spread of disease is ultimately derived from the Commerce Clause, which grants Congress authority "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." *See* U.S. Const. art. I, § 8. As explained below, however, the Eviction Moratorium Order cannot be justified under the Commerce Clause, either by itself or in combination with the Necessary and Proper Clause. At a minimum, the Order's justification under the Commerce and Necessary and Proper Clauses is sufficiently questionable in order for Plaintiffs to meet the standard for preliminary injunctive relief. *See Certified Restoration*, 511 F.3d at 543 (if "the movant has raised questions going to the merits so serious, substantial, and doubtful as to make them fair ground for litigation and thus for more deliberate investigation," then a preliminary injunction is permissible).

### A. The Eviction Moratorium Order cannot be justified under the Commerce Clause.

In *United States v. Lopez*, 514 U.S. 549, 558-59 (1995), the Court laid out three categories of activities that fell within the Commerce Clause: (1) activities involving the "the channels of interstate commerce"; (2) activities involving "the instrumentalities of interstate commerce"; and (3) "those activities having a substantial relation to interstate commerce . . . *i.e.*, those activities that substantially affect interstate commerce." The Court later clarified that the third category—the substantial effects test—is derived from the Necessary and Proper Clause, not the Commerce Clause alone. *See Gonzales v. Raich*, 545 U.S. 1, 5, 22 (2005); *id.* at 34

(Scalia, J., concurring) (explaining more fully the relationship between the substantial effects test and the Necessary and Proper Clause).[4]

Here, there is no reasonable dispute that the first two *Lopez* categories are not at issue. The Eviction Moratorium Order does not regulate roads, train tracks, or rivers—*i.e.*, the channels of interstate commerce—nor who or what may travel on them—*i.e.*, the instrumentalities of interstate commerce. It regulates the removal of unlawfully present individuals from private property existing entirely in one state. 85 Fed. Reg. 55296. The Order therefore may be justified, if at all, only under the substantial effects test, which is derived from the Necessary and Proper Clause.

---

[4]     There is some dispute in other circuits about whether Justice Scalia's concurring opinion in *Raich* on the interplay between the Necessary and Proper Clause and the Commerce Clause is controlling. *See People for the Ethical Treatment of Prop. Owners v. United States Fish & Wildlife Serv.*, 852 F.3d 990, 1005, n.8 (10th Cir. 2017). However, the majority in *Raich* acknowledged it was applying the Necessary and Proper Clause, not the Commerce Clause alone. *Raich*, 545 U.S. at 5, 22. Moreover, Justice Scalia's approach was adopted by nine separate justices in *NFIB v. Sebelius* and has been approved by the Fifth Circuit. *See NFIB*, 567 U.S. at 561 (Roberts, C. J.) (referring to *Raich* as a Necessary and Proper Clause case); *id.* at 618 (Ginsburg, Sotomayor, Breyer and Kagan, concurring in part, concurring in the judgment in part, and dissenting in part) (quoting from Justice Scalia's concurring opinion in *Raich* to explain the scope of the Necessary and Proper Clause); *id.* at 653 (Scalia, Kennedy, Thomas, and Alito, dissenting) (adopting Justice Scalia's position that *Raich*, *Lopez*, and *Morrison* were Necessary and Proper Clause cases); *United States v. Whaley*, 577 F.3d 254, 260 (5th Cir. 2009) (specifically adopting Scalia's concurring opinion on the Necessary and Proper Clause as controlling in this Circuit). Several other circuits have also taken this approach. *See, e.g.*, *United States v. Guzman*, 591 F.3d 83, 91 (2d Cir. 2010) (interpreting *Raich* as a Necessary and Proper Clause case); *United States v. Sullivan*, 451 F.3d 884, 888-90 (D.C. Cir. 2006) (same); *United States v. Anderson*, 771 F.3d 1064, 1068-71 (8th Cir. 2014) (same). We therefore apply that framework here.

**B. The Eviction Moratorium Order is neither necessary to, nor proper for, the exercise of an enumerated power.**

The Necessary and Proper Clause allows the federal government to "make all Laws which shall be necessary and proper for carrying into Execution [its enumerated powers]." U.S. Const. art. I, § 8, cl. 18. With regard to the Commerce Clause, the Supreme Court has held that the Necessary and Proper Clause allows the federal government to regulate purely intrastate activities that substantially effect interstate commerce as a means to carry into execution its authority over interstate commerce. *See Raich*, 545 U.S. at 22.

However, any invocation of this implied power must be examined "carefully to avoid creating a general federal authority akin to the police power." *NFIB v. Sebelius*, 567 U.S. 519, 536, 132 S.Ct. 2566, 2578 (2012).[5] If a court determines that the relationship to commerce is too tenuous, or that the invocation of the commerce authority is simply "pretext" to pass laws for other purposes, that court has the "painful duty" of ruling that the government's exercise of power is unsupported by the Necessary and Proper Clause and thus unconstitutional. *See McCulloch*, 17 U.S. (4 Wheat.) at 423.

---

[5]     The opinion in *NFIB* was fractured, leading to some dispute about what portions of Chief Justice Roberts' opinion were controlling. However, the Fifth Circuit recently observed that a majority of the justices in that case found that the individual mandate could not be supported under either the Commerce Clause or the Necessary and Proper Clause. Accordingly, because the underlying reasoning of Justice Roberts' lone opinion and that of the four joint dissenters mirrored each other, *NFIB*'s treatment of the Commerce Clause and Necessary and Proper Clause should be applied to this case. *See Texas v. United States*, 945 F.3d 355, 388 (5th Cir. 2019).

To meet this burden, a restriction on intrastate activity must be both necessary—*i.e.,* "plainly adapted" to the regulation of interstate commerce—and proper—*i.e.*, consistent "with the letter and spirit of the constitution." *NFIB*, 567 U.S. at 537. The Eviction Moratorium Order fails both tests.

**1. The Eviction Moratorium Order is not plainly adapted to the regulation of interstate commerce.**

As explained by Justice Scalia in *Raich*, the plainly adapted standard effectively tracks the evidence-based, federalism-sensitive form of rational basis applied in *Lopez* and *Morrison*. *See Raich*, 545 U.S. 1, 35-36 (Scalia, concurring). In *United States v. Morrison*, 529 U.S. 598, 610-12 (2000), the Court laid out four factors to be considered in determining whether the requisite substantial effect on interstate commerce had been met: (1) the economic nature of the intrastate activity; (2) the presence of a jurisdictional element in the statute, which limits its application to matters affecting interstate commerce; (3) any congressional findings in the statute or its legislative history concerning the effect that the regulated activity has on interstate commerce; and (4) the attenuation of the link between the intrastate activity and its effect on interstate commerce. Each of these factors cuts in Plaintiffs' favor.

**a. The Eviction Moratorium Order does not regulate economic activity.**

To "figure out whether an activity substantially affects interstate commerce, the first question we must ask is whether the regulated activity is an activity economic in nature." *Groome Res., Ltd. v. Par. of Jefferson*, 234 F.3d 192, 205 (5th

Cir. 2000). In determining whether the regulated activity is economic, courts look "only to the expressly regulated activity" itself. *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 634 (5th Cir. 2003). The motivation behind the activity or its ultimate effects are irrelevant for this part of the analysis. *See id.* at 633.

In *GDF Realty*, for example, the Fifth Circuit reversed a district court's holding that the Endangered Species Act's prohibition on harming endangered species was a regulation of economic activity for the purpose of its Commerce Clause analysis. The district court had concluded that the prohibition on disturbing endangered species was a regulation of economic activity because endangered species are most often disturbed for economic reasons and the species disturbance at issue in *GDF Realty* was due to the plaintiff's desire to build a commercial development. *Id* at 633. The Fifth Circuit rejected that approach, finding the fact that species are often disturbed in furtherance of economic ends insufficient to render the prohibition on species disturbance a regulation of economic activity. *Id*. at 633. The court instead focused on what was actually being prohibited—*i.e.* the disturbance of species. *Id*. Because disturbing species is not always or inherently an economic activity, prohibition on such activities could not be construed as an economic regulation for Commerce Clause purposes. *Id*.

Here, the Eviction Moratorium Order expressly regulates only evictions. Like the disturbance of an endangered species, evictions often occur for economic reasons and can have economic effects, but the eviction itself is not economic activity. To the extent that the Order punishes legal proceedings associated with evictions, it

punishes the invocation of a legal right that can be exercised for economic or non-economic reasons. *See Gustafson v. Springfield, Inc.*, 2020 PA Super 239 * 48 (2020) (quoting *Lopez*, 514 U.S. at 567) ("the filing of a state lawsuit, in state court, based on state tort law, 'is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce'") And to the extent that the Order punishes the actual removal of the individual from private property, it regulates a fundamental property right in a way almost indistinguishable from the activity regulated *GDF Realty*. *See* 326 F.3d at 634 (removal of a species from private property, even for economic reasons, was not economic activity). The Eviction Moratorium Order is therefore not a regulation of economic activity.

The CDC may point to *Groome Res., Ltd. v. Par. of Jefferson*, 234 F.3d 192 (5th Cir. 2000), but that case is inapposite. In *Groome*, the plaintiff challenged the anti-discrimination provisions of the Fair Housing Act as exceeding congressional authority under the Commerce Clause. The plaintiff argued that the federal prohibition on discrimination in the buying, selling, or renting of commercial housing was not the regulation of an economic activity. *Id.* at 205. The Fifth Circuit disagreed, noting that discrimination in the sale or rental of commercial property directly affects the "individual's ability to buy, sell, or rent housing." *Id.* at 205-06. And because discrimination "directly interferes with a commercial transaction," it is "an act that can be regulated to facilitate economic activity." *Id.*

That sort of regulation is not at issue here. The Eviction Moratorium Order does not directly regulate commercial transactions. It does not affect an individual's

ability to rent a home. It does not set the rates for rent to be charged, or even forbid Plaintiffs from collecting rents. 85 Fed. Reg. 55296. Nor does the Order require that Plaintiffs do business with a protected class that they might otherwise wish to disassociate with. It instead forbids Plaintiffs from exercising their fundamental right to remove individuals who are unlawfully present from their property. That is not the regulation of a commercial transaction, but rather a regulation on the right to exclude individuals from one's private property and to initiate state legal proceedings in pursuit of that right. *See GDF Realty*, 326 F.3d at 634; *Gustafson,* 2020 PA Super 239 * 48.

### b. The Eviction Moratorium Order does not contain any jurisdictional element that would limit its reach to only those evictions affecting interstate commerce.

The next factor the court must consider is whether the law has an "express jurisdictional element which might limit its reach to a discrete set of [activities] that additionally have an explicit connection with or effect on interstate commerce." *Morrison*, 529 U.S. at 611-12. A common example of such a "jurisdictional element" is laws that allow federal regulation only where the regulated item or person "has traveled across state lines". *Id*. at 613 n.5.

The Eviction Moratorium Order does not contain a "jurisdictional element." The Order applies on its face to any eviction that meets the criteria, regardless of whether the individual has been exposed to COVID-19, and regardless of whether the individual has traveled or intends to travel across state lines. This factor therefore cuts in Plaintiffs' favor.

### c. The Eviction Moratorium Order contains no findings suggesting that it is essential to a broader economic regulatory scheme.

The court must next consider the extent to which the government regulation is supported by findings. When, as in this case, the regulation is of non-economic activity, these findings need to show that the regulation is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561.

The Order here does not merely present a circumstance where findings fall short of this standard. Instead, the Order contains *no* findings regarding a broader regulatory scheme at all. How a failure to prohibit evictions would affect any broader regulation of interstate commerce is never addressed. Nor could it be, as there is no broader regulation of interstate commerce at issue. The Eviction Moratorium Order is not a small part of a broader regulation on prices of a fungible commodity sold within a national market. *See, e.g.*, *Raich*, 545 U.S. 1, (market for marijuana); *Wickard v. Filburn*, 317 U.S. 111 (1942) (market for wheat). Nor is it a subset of a large piece of legislation prohibiting discrimination in commercial relationships. *See, e.g.*, *Groome*, 234 F.3d at 205-06 (Fair Housing Act). Instead, the Order is an isolated agency action ostensibly designed to prevent individuals infected with COVID-19 from traveling across state lines. There is no federal law that makes travel across state lines by those infected by COVID-19 illegal. Even if such a law existed, there are no findings in the Order showing that enforcement of such a law would be undercut if the federal government could not stop local evictions of non-infected renters.

Comparing the findings of the Eviction Moratorium Order to those deemed sufficient in *Raich* is instructive. In *Raich,* the Court noted that there were extensive congressional findings that, "given the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere," regulation of interstate marijuana would be substantially undercut if Congress could not regulate intrastate marijuana. *See Raich*, 545 U.S. at 22; *id*. at 12 n.20 (laying out additional congressional findings in support of this claim). By contrast, there are no findings in the Order here that the federal government will be unable to regulate the interstate transmission of COVID-19 without also prohibiting intrastate residential evictions of non-infected renters.

### d. The limited findings on evictions do not show substantial effects on interstate commerce.

Assuming, arguendo, that the Eviction Moratorium Order is a regulation of economic activity, the question would then become whether any findings support a claim that the regulated activity of evictions has a substantial effect on interstate commerce. Even read leniently, the findings in the Order do not meet this burden. The only "findings" in the order are that approximately 15% of individuals that move in a given year (for any reason) have historically ended up relocating across state lines. 85 Fed. Reg. 55295. From this lone data point, the CDC concludes that: (1) hypothetically, some percentage of evicted individuals will also relocate across state lines; (2) some percentage of those hypothetical interstate movers *may* have COVID-19; (3) therefore, evictions *may* result in some increased travel across state lines by those infected by COVID-19; and (4) this, in turn, *may* increase the spread of the virus

across state lines. *Id.*

These bare conclusions are not findings. *See Morrison*, 529 U.S. at 614 ("Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so."). These assertions come unaccompanied by any supporting data. There is no study linking evictions to the actual spread of COVID-19. There is no data on the number or percentage of individuals affected by COVID-19 that may be evicted. There is no evidence that these evictions will cause infected individuals to move across state lines. There is simply *ipse-dixit*, that hypothetically evictions could result in some non-zero number of individuals infected with COVID-19 engaging in interstate travel.

As explained below, even if these *ipse dixit* statements could be considered findings, "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Morrison*, 529 U.S. at 614. In *Morrison*, for example, the government's argument was "supported by numerous findings regarding the serious impact" of the regulated activity. *Id.* The Court nonetheless concluded that it was required to independently weigh the reasoning behind those findings. *Id.* As explained below, the Eviction Moratorium Order's conclusions fail to survive meaningful scrutiny.

### e. Any connection between the Order and interstate commerce is too tenuous.

The next factor the court must consider is the level of fit between the facts in the record and any alleged substantial effect on interstate commerce. If the fit is too tenuous or requires the court to "pile inference upon inference" to arrive at the

government's conclusions, then the court will not find the requisite substantial effect. *Lopez*, 514 U.S. at 567.

For example, the Court in *Lopez* considered the constitutionality of the Gun Free School Zones Act under the substantial effects test. The government argued that regulating firearms in schools had a sufficient connection to interstate commerce because: (1) "possession of a firearm in a school zone may result in violent crime"; (2) violent crime can be expected to affect the functioning of the national economy by raising insurance rates; and (3) violent crime reduces the willingness of individuals to engage in interstate travel to places that are deemed unsafe. *Lopez*, 514 U.S. 563-64. The Court held that this chain of causation was too tenuous to justify regulation under the Commerce Clause. In our modern economy, the Court noted, almost anything can have some effect on commerce. If this "view of causation" were sufficient to justify federal regulation under the Commerce Clause, it "would obliterate the distinction between what is national and what is local in the activities of commerce." *Id.* at 567.

Similarly, in *Morrison*, the government argued that gender motivated violence had sufficient effects on interstate commerce to justify the Violence Against Women Act. In that case, the government argued that violence against women substantially affects interstate commerce "by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; . . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and

the demand for interstate products." *Morrison*, 529 U.S. at 615. Once again, the Court rejected the government's extended theories of causation. As the Court explained, the government's theory of causation would justify regulating virtually anything—including traditional state matters such as family law and divorce—because local issues such as family law and divorce have equal or greater effects in the aggregate on interstate travel and the national economy than does domestic violence. *Id.* 615-16

*Lopez* and *Morrison* are dispositive here. The CDC claims that its prohibition on evictions is necessary because a non-zero amount of those evicted *may* be positive for COVID-19 when they *may* move across state lines and therefore *may* spread COVID-19, which *may* have economic effects. But as in *Morrison*, that tenuous, multi-step causal connection to interstate commerce and interstate travel would likewise justify a federal moratorium on divorce—a type of regulation that the Supreme Court listed as wholly beyond federal control. *See Morrison*, 529 U.S. at 615 (specifically rejecting a reading of the substantial effects test that would allow the federal government to regulate divorce). Like evictions, divorce proceedings involve the allocation of resources, which certainly have economic effects. *See id.* Moreover, like evictions, it is not difficult to imagine that a non-zero number of divorcees move to another state after the divorce is granted to be closer to remaining family or just to get away from their ex-spouse. Thus, if the CDC's theory is correct, even divorce would be subject to federal control under the Commerce Clause—an outcome rejected in *Morrison*.

## 2. Even if the Eviction Moratorium Order were found to be Necessary, it is not Proper.

Even assuming that the government could show that the regulation at issue here was "necessary" under the four-part test above, this Court would still need to evaluate whether the regulation was "proper." *NFIB*, 567 U.S. at 560; *see also Raich*, 545 U.S. at 39 (Scalia, J., concurring) (adding the "proper" analysis as an additional consideration after the *Morrison* factors).

To be "proper," a regulation of intrastate conduct "may not be otherwise 'prohibited' and must be 'consistent with the letter and spirit of the constitution.'" *Raich*, 545 U.S. at 39 (quoting *McCulloch v. Maryland*, 17 U.S. 316, 421-22 (1819)). These "phrases are not merely hortatory," but reflect a solemn command to the Court. *Id.* (citing *Printz v. United States*, 521 U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144, (1992)).

Among other things, a regulation is not "proper for carrying into Execution the Commerce Clause when it violates a constitutional principle of state sovereignty," *id.*, "undermine[s] the structure of government established by the Constitution," *NFIB*, 567 U.S. at 559, or marks a novel or "substantial expansion of federal authority" into areas traditionally reserved to individuals or to the states. *See id.*

In *NFIB,* the Court demonstrated that the "proper" prong of the Necessary and Proper Clause has teeth. That case involved the constitutionality of the Affordable Care Act's national mandate to purchase health insurance. The government argued that the mandate was essential to its broader regulatory scheme to drive down the cost of health insurance, and therefore justified as a Necessary and Proper action in

furtherance of the regulation of interstate commerce. A majority of the members on the Court disagreed: "Even if the individual mandate [were] 'necessary' to the Act's insurance reforms" the Court concluded, such an expansion of federal power into traditional matters of state concern was "not a 'proper' means for making those reforms effective." *Id.* at 560 (Roberts, C.J.); *id.* at 653 (joint dissent) ("the scope of the Necessary and Proper Clause is exceeded not only when the congressional action directly violates the sovereignty of the States but also when it violates the background principle of enumerated [and hence limited] federal power").

The same reasoning applies here. First, the Eviction Moratorium Order is, to the best of Plaintiffs' knowledge, the first of its kind. While not dispositive, "sometimes 'the most telling indication of a severe constitutional problem . . . is the lack of historical precedent'" for the federal action. *Id.* at 549 (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010)). "At the very least, we should 'pause to consider the implications of the Government's arguments' when confronted with such new conceptions of federal power." *Id.* at 550 (quoting *Lopez, supra,* at 564.) At the preliminary injunction phase, this constitutional doubt may be sufficient to grant relief. *Certified Restoration*, 511 F.3d at 543.

Second, the Eviction Moratorium Order marks a substantial expansion of federal power into matters of traditional state concern, with significant effects on state sovereignty. On its face, the Order regulates private property rights and state legal proceedings—both of which are traditional state functions. *Hess v. Port Aut. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994) ("[R]egulation of land use [is] a function

traditionally performed by local governments"); The Federalist No. 17[6] ("The administration of private justice between the citizens of the same State... [is] proper to be provided for by local legislation [and] can never be desirable cares of a general jurisdiction.")

Finally, there is simply no limiting principle to the CDC's theory of federal authority in this case that would prevent the Commerce Clause from becoming a general police power akin to that held by the states. *See NFIB*, 567 U.S. at 536. As explained *supra*, the CDC relies on the claim that evictions may have some non-zero effect on individuals moving across state lines as the basis for its authority here. But as the Supreme Court has recognized, almost any intrastate activity can have such an effect. *Morrison*, 529 U.S. at 611. Divorce, local crime, classroom curriculum in public schools, and countless other intrastate matters all have effects on when and whether individuals move. *See Lopez*, 514 U.S. at 565. But those sorts of activities have traditionally been viewed as the sole province of the state. *Id*. Thus, an expansion of federal power such as the one attempted here cannot be said to be "proper." At a bare minimum, the propriety of such an expansion is sufficiently in doubt to warrant injunctive relief.

## II.  Plaintiffs Are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief.

There also exists a substantial risk that Plaintiffs will suffer irreparable harm if this Order is not enjoined. *See, e.g.*, Declaration of Lauren Terkel, ¶ 13; Declaration

---

[6]      Available at https://avalon.law.yale.edu/18th_century/fed17.asp

of Carol C. Moore, ¶¶ 23-24; Declaration of Jerry D. Moore, ¶¶ 22-23; Declaration of Justin MacDonald, ¶¶ 9, 13, 22. "[W]hen 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Here, Plaintiffs' harm stems from both the constitutional injury this Order inflicts and the unrecoverable financial damages that are likely to result.

First, the violation of constitutional limitations, standing alone, is sufficient to establish irreparable harm. *See Deerfield Med. Ctr. v. Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). Accordingly, if this Court concludes that Plaintiffs have a reasonable likelihood of success on the merits of their constitutional claims, then irreparable harm is likewise established. 11A C. Wright, A. Miller, & Mary Kay Kane, *Federal Practice and Procedure*, § 2948.1 at 161 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.")

Second, even if a further showing were necessary, Plaintiffs meet that burden because any damages caused by lost rents will likely be unrecoverable. *See Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 312 (5th Cir. 2008) (per curiam) ("The absence of an available remedy by which the movant can later recover monetary damages may be sufficient to show irreparable injury.") (cleaned up); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring)

("[A] regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.").

Financial injuries are usually sufficient to establish irreparable harm for the purposes of establishing a right to injunctive relief if the defendant is protected from damage claims by sovereign immunity[7] or if a suit against a private defendant would be difficult to recover on due to a defendant's economic condition. *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 Fed. Appx. 259, 273 (5th Cir. 2014); *Teladoc, Inc. v. Tex. Med. Bd.*, 112 F.Supp.3d 529, 543 (W.D. Tex. 2015). Both concerns are present here.

Plaintiffs are barred by sovereign immunity from collecting money damages from the CDC in this case. *Modoc Lassen Indian Hous. Auth. v. United States HUD*, 881 F.3d 1181, 1195 (10th Cir. 2017); *State v. United States*, 336 F.Supp.3d 664, 672 (N.D. Tex. 2018) (reversed on other grounds). "Suits against federal agencies are barred by sovereign immunity absent a specific waiver of that immunity." *Modoc*, 881 F.3d at 1195. While 5 U.S.C. § 702 waives sovereign immunity for claims against agencies, it is limited to suits "seeking relief *other than* money damages" (emphasis added)); *see also Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988).

---

[7]     *See, e.g.*, *Teladoc, Inc. v. Texas Med. Bd.*, 112 F.Supp.3d 529, 543 (W.D. Tex. 2015) ("The possibility that the [the State of Texas] will assert immunity from monetary damages as a state agency also weighs in favor of finding Plaintiffs face irreparable harm."); *Harris v. Cantu*, 81 F.Supp.3d 566, 580 (S.D. Tex. 2015), rev'd sub nom. *Harris v. Hahn*, 827 F.3d 359 (5th Cir. 2016) ("Because Defendants are entitled to Eleventh Amendment immunity from money damages, Plaintiff is unable to recover his past tuition payments that would not have been required from him but for his having been unconstitutionally excluded from the Act's benefits. Accordingly, Plaintiff has suffered and—if no injunction is issued—will continue to suffer irreparable injury for which money damages are inadequate.")

Plaintiffs are equally unlikely to recover their losses from the renters that they currently seek to evict. While it may be possible to secure judgments for accumulated back rent, collecting those judgments from individuals who allegedly lacked the resources to pay rent in the first place would be highly unlikely. *See* Declaration of Carol C. Moore, ¶ 19; Declaration of Jerry D. Moore, ¶ 18; Declaration of Justin MacDonald, ¶ 11. That alone is sufficient to establish irreparable injury. *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 Fed. Appx. 259, 273 (5th Cir. 2014); *Teladoc, Inc. v. Tex. Med. Bd.*, 112 F.Supp.3d 529, 543 (W.D. Tex. 2015).

Moreover, an award of damages for back rent would be wholly inadequate to cure the harm suffered by Plaintiffs to their property rights. In particular, such an award would do nothing to restore their constitutional right to exclude others from their properties. As the Supreme Court has recognized, that right is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *See Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994).

Furthermore, Plaintiffs' inability to remove non-paying tenants will have ripple effects that a judgment for back rent would not cover. While the Eviction Moratorium Order has reduced Plaintiffs' ability to collect rent, it has not reduced Plaintiffs' operating costs, staffing costs, utility obligations, maintenance costs, property tax payments, or mortgage payments. Declaration of Lauren Terkel, ¶ 12; Declaration of Justin MacDonald, ¶ 23. The Order therefore will affect Plaintiffs' options on what services to provide to their other paying tenants, whom to hire or fire, and how to operate their properties. This increased regulatory burden on

Plaintiffs is itself an irreparable injury. *See California v. Trump*, 267 F.Supp.3d 1119, 1133 (N.D. Cal. 2017) (holding that a state "incurring significant administrative costs" to respond to federal action suffers irreparable harm). Any one of these injuries would be sufficient to establish irreparable harm: taken together though, they place the matter beyond all doubt.

## III. The Threatened Injury to Plaintiffs Outweighs Whatever Damage a Preliminary Injunction May Cause Defendants.

The third factor is whether "the threatened injury outweighs any damage that the injunction might cause the defendant." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). That factor also cuts in Plaintiffs' favor. As noted above, if this injunction is not granted, Plaintiffs' injuries will likely be significant. By contrast, Defendants' injury is largely limited to being unable to enforce an unconstitutional executive action. While the government generally has an interest in having its laws enforced, when a law "is likely unconstitutional, [government's] interests do not outweigh [Plaintiffs'] in having [their] constitutional rights protected." *Awad v. Ziriax*, 670 F.3d 1111, 1131-32 (10th Cir. 2012); *Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 699 (9th Cir. 1997).

The government will likely argue that it has an interest in preventing the spread of COVID-19, but that argument fails. There is no evidence that the tenants that Plaintiffs seek to evict are infected or that evictions lead to the interstate spread of COVID-19. Nor is the Eviction Moratorium Order limited to the eviction of COVID-19 patients. The CDC may not pretend that its Order is something that it clearly is not in order to avoid injunctive relief. The balance of interests thus favors granting a

preliminary injunction.

## IV. An Injunction of this Unconstitutional Action Will Serve the Public Interest

If the Court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their constitutional claims, it should grant the preliminary injunction because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citation omitted) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012); *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[T]he Government does not have an interest in the enforcement of an unconstitutional law.") (cleaned up).

There is also a strong public interest that contracts be honored, that apartments stay open, and that property rights be respected. "The right of acquiring and possessing property, and having it protected, is one of the natural, inherent, and unalienable rights of man." *VanHorne's Lessee v. Dorrance*, 2 U.S. 304, 310 (1795). Securing those rights is what "induced them to unite in society." *Id*. No person "would become a member of a community, in which he could not enjoy the fruits of his honest labour and industry." *Id*. The enforcement of contracts and the "preservation of property then is a primary object of the social compact." *Id*. The protection of this fundamental bedrock of our society from arbitrary agency actions is always in the public interest.

## CONCLUSION

The Court should issue a preliminary injunction, enjoining Defendants from

enforcing the Eviction Moratorium Order.

Respectfully Submitted,

*/s/ Robert Henneke*

ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
RYAN D. WALTERS
Texas Bar No. 24105085
rwalters@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, TX 78701
Telephone:   (512) 472-2700
Facsimile:     (512) 472-2728

KIMBERLY S. HERMANN
(*pro hac vice* pending)
Georgia Bar No. 646473
khermann@southeasternlegal.org
CELIA HOWARD O'LEARY
(*pro hac vice* pending)
Georgia Bar No. 747472
coleary@southeasternlegal.org
SOUTHEASTERN LEGAL FOUNDATION
560 West Crossville Rd., Ste. 104
Roswell, GA 30075
Telephone: (770) 977-2131

***Attorneys for Plaintiffs***

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was electronically filed on October 22, 2020, and sent via certified mail, return receipt requested on October 23, 2020, to:

Centers for Disease Control and Prevention
1600 Clifton Road
Atlanta, GA 30329

Director Robert R. Redfield
Centers for Disease Control and Prevention
1600 Clifton Road
Atlanta, GA 30329

Acting Chief of Staff Nina Witkofsky
Centers for Disease Control and Prevention
1600 Clifton Road
Atlanta, GA 30329

U.S. Dept. of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201

Secretary Alex Azar
U.S. Department of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201

U.S. Department of Justice
Civil Process Clerk
950 Pennsylvania Ave., SW
Washington, DC 20530

Stephen J. Cox
U.S. Attorney for the Eastern District of Texas
110 North College, Suite 700
Tyler, TX 75702

/s/ Robert Henneke
ROBERT HENNEKE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| LAUREN TERKEL; PINEYWOODS ARCADIA HOME TEAM, LTD; LUFKIN CREEKSIDE APARTMENTS, LTD; LUFKIN CREEKSIDE APARTMENTS II, LTD; LAKERIDGE APARTMENTS, LTD; WEATHERFORD MEADOW VISTA APARTMENTS, LP; and MACDONALD PROPERTY MANAGEMENT, LLC; | § § § § § § § § § | |
| *Plaintiffs,* | § § | CIVIL ACTION NO. _____ |
| v. | § § | JUDGE _____ |
| CENTERS FOR DISEASE CONTROL AND PREVENTION; ROBERT R. REDFIELD, in his official capacity as Director of the Centers for Disease Control and Prevention; NINA WITKOFSKY, in her official capacity as Acting Chief of Staff for the Centers for Disease Control and Prevention; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ALEX AZAR, in his official capacity as Secretary of the Department of Health and Human Services; | § § § § § § § § § § § § § § § § | |
| *Defendants.* | § | |

## DECLARATION OF LAUREN TERKEL

I, Lauren Terkel, hereby declare as follows:

1. I am over the age of eighteen (18), of sound mind, and capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct. I am a resident of the State of Texas.

2. In 2019, I inherited a single-family home located at 712 S. College Avenue, Tyler, Texas 75701, which is in Smith County.

3. I am the sole owner of this property, which had previously been converted into a four-unit rental property prior to my having inherited it.

4. Since taking ownership of the property, I have endeavored to maintain and upgrade the property in an effort to service my current tenants as well as attract new renters as needed.

5. Three of the property's four units are currently occupied by tenants that meet all their responsibilities pursuant to our leasing agreement, including paying the agreed upon rent.

6. However, the fourth unit is currently occupied by a tenant (the "non-paying tenant") that has not made any rental payment for two months and currently owes approximately $1,700 in back rent.

7. In September 2020, I brought an eviction suit against the non-paying tenant for his refusal to pay rent.

8. After that suit was initiated, the non-paying tenant submitted a declaration on September 30, 2020, pursuant to the CDC's emergency agency order *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 85 Fed. Reg. 55292 (Sept. 4, 2020) (the "CDC Order").

9. When informed about the declaration, the Justice of the Peace overseeing the eviction suit (the "judge") entered an order that cited the CDC Order, attached the non-paying tenant's declaration, and abated the eviction proceedings until January 18, 2021, thus denying me the eviction relief that I sought and am entitled to under state law. A true and correct copy of the judge's order and the non-paying tenant's declaration is attached.

10. The judge's sole expressed rationale for abating the eviction proceedings and allowing the non-paying tenant to continue to reside on my property was his receipt of the declaration.

11. My monthly expenses for upkeep on this rental property are approximately $1,190.

12. While the rental income I receive has decreased because I am unable to evict the non-paying tenant so that I can replace him with a tenant that pays rent, my expenses to maintain the property have largely remained the same.

13. I have received written correspondence from at least one of the other tenants informing me of their intent to move out if the non-paying tenant is not removed from the property.

14. I have continued to maintain the rental property in compliance with all my legal obligations as landlord and the non-paying tenant possesses no other defense for his failure to pay rent.

15. I rely upon the monthly rental income from my tenants to timely make payments for utilities, property taxes, repairs, and other expenses associated with owning the property.

16. But for the CDC Order, I would have exercised my legal rights under state law to evict the non-paying tenant from my property.

17. As the landlord of a residential rental property, I anticipate that it will be necessary for me to utilize these state court remedies in order to remove tenants for non-payment of rent in the future and I fully intend to exercise my rights under state law to take such action when the CDC Order no longer prevents me from doing so.

Pursuant to 28 U.S.C. § 1746, I, Lauren Terkel, declare under penalty of perjury that the foregoing is true and correct. Executed on this __21__ day of October, 2020, in Plano, Texas.

_Lauren Terkel_
Lauren Terkel



CAUSE NO. _E20-233 JP1_

NWP Management
PLAINTIFF

§
§
§

IN THE JUSTICE COURT

v.

§
§

PRECINCT NO. 1

Tiffany Billingsley; Ryan Coats
DEFENDANT

§
§
§

SMITH COUNTY, TEXAS

## ORDER ABATING EVICTION CASE

On this the ___30th___ day of __September__, 2020, this Court has been provided notice that a Declaration pursuant to the Centers for Disease Control and Prevention's agency order, titled Temporary Halt in Residential Evictions to prevent the Further Spread of COVID-19 (CDC Order) and the Texas Supreme Court's 25th Emergency Order has been served on the plaintiff in this case by the defendant.

This Court ORDERS that this case be abated until January 1, 2021.

This case is reset for ___January 18th___, 2021 (*must be after Jan 1, 2021*) for (check one):

☑ Trial
☐ Pretrial hearing to determine case status

Any further scheduling of this case will be issued in a separate notice or order from this Court.

**ISSUED AND SIGNED** this the ___30th___ day of __September__, 20_20_

Judge Quincy Beavers, Jr.
Justice of the Peace, Pct. 1
Smith County, Texas
200 E. Ferguson, Ste. 501
Tyler, Texas 75702
Phone: 903-590-2601
Fax:    903-590-2607



**DECLARATION UNDER PENALTY OF PERJURY FOR THE CENTERS FOR DISEASE CONTROL AND PREVENTION'S TEMPORARY HALT IN EVICTIONS TO PREVENT FURTHER SPREAD OF COVID-19**

This declaration is for tenants, lessees, or residents of residential properties who are covered by the CDC's order temporarily halting residential evictions (not including foreclosures on home mortgages) to prevent the further spread of COVID-19. Under the CDC's order you must provide a copy of this declaration to your landlord, owner of the residential property where you live, or other person who has a right to have you evicted or removed from where you live. ***Each adult listed on the lease, rental agreement, or housing contract should complete this declaration.*** Unless the CDC order is extended, changed, or ended, the order prevents you from being evicted or removed from where you are living through December 31, 2020. You are still required to pay rent and follow all the other terms of your lease and rules of the place where you live. You may also still be evicted for reasons other than not paying rent or making a housing payment.

***This declaration is sworn testimony, meaning that you can be prosecuted, go to jail, or pay a fine if you lie, mislead, or omit important information. I certify under penalty of perjury, pursuant to 28 U.S.C. 1746, that the following are true and correct:***

• I have used best efforts to obtain all available government assistance for rent or housing;

• I either expect to earn no more than $99,000 in annual income for Calendar Year 2020 (or no more than $198,000 if filing a joint tax return), was not required to report any income in 2019 to the I.R.S., or received an Economic Impact Payment (stimulus check) pursuant to Section 2201 of the CARES Act;

• I am unable to pay my full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses;

• I am using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses;

• If evicted I would likely become homeless, need to move into a homeless shelter, or need to move into a new residence shared by other people who live in close quarters because I have no other available housing options.

• I understand that I must still pay rent or make a housing payment, and comply with other obligations that I may have under my tenancy, lease agreement, or similar contract. I further understand that fees, penalties, or interest for not paying rent or making a housing payment on time as required by my tenancy, lease agreement, or similar contract may still be charged or collected.

• I further understand that at the end of this temporary halt on evictions on December 31, 2020, my housing provider may require payment in full for all payments not made prior to and during the temporary halt and failure to pay may make me subject to eviction pursuant to State and local laws. I understand that any false or misleading statements or omissions may result in criminal and civil actions for fines, penalties, damages, or imprisonment.

_____     _____9-30-20_____
Signature of Declarant                            Date

"Available Government Assistance" means any government rental or housing payment benefits available to the individual or any household member

An "Extraordinary" medical expense is any unreimbursed medical expense likely to exceed 7.5% of one's adjusted gross income for the year.

"Available Housing" means any available, unoccupied residential property, or other space for occupancy in any seasonal or temporary housing that would not violate Federal, State, or Local occupancy standards and that would not result in an overall increase of housing cost to you.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

LAUREN TERKEL; PINEYWOODS ARCADIA HOME TEAM, LTD; LUFKIN CREEKSIDE APARTMENTS, LTD; LUFKIN CREEKSIDE APARTMENTS II, LTD; LAKERIDGE APARTMENTS, LTD; WEATHERFORD MEADOW VISTA APARTMENTS, LP; and MACDONALD PROPERTY MANAGEMENT, LLC;

    *Plaintiffs,*

v.

CENTERS FOR DISEASE CONTROL AND PREVENTION; ROBERT R. REDFIELD, in his official capacity as Director of the Centers for Disease Control and Prevention; NINA WITKOFSKY, in her official capacity as Acting Chief of Staff for the Centers for Disease Control and Prevention; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ALEX AZAR, in his official capacity as Secretary of the Department of Health and Human Services;

    *Defendants.*

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

CIVIL ACTION NO. _____

JUDGE _____

## DECLARATION OF CAROL C. MOORE

I, Carol C. Moore, hereby declare as follows:

1.    I am over the age of eighteen (18), of sound mind, and capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.    I am the President of PAHT, Inc., a Texas corporation with its principle place of business in Lufkin, Angelina County, Texas.

3.      PAHT, Inc., is the General Partner of Pineywoods Arcadia Home Team, LTD, which is a named plaintiff in this case.

4.      Pineywoods Arcadia Home Team, LTD, is a Texas limited partnership based in the City of Lufkin in Angelina County, Texas.

5.      I am a representative of Pineywoods Arcadia Home Team, LTD, authorized to make this declaration on behalf of said company.

6.      Pineywoods Arcadia Home Team, LTD, owns a 26-unit multi-family property located at 673 Arcadia Rd., Center, Texas 75935.

7.      This multi-family property in Center is a Low-Income Housing Tax Credit property that requires all residents to pass income eligibility requirements as part of the initial rental application process.

8.      I am the sole manager of PED-Creekside, LLC, a Texas limited liability company based in Lufkin, Angelina County, Texas.

9.      PED-Creekside, LLC is the General Partner of Lufkin Creekside Apartments II, LTD, which is a named plaintiff in this case.

10.     Lufkin Creekside Apartments II, LTD, is a Texas limited partnership based in the City of Lufkin in Angelina County, Texas.

11.     I am a representative of Lufkin Creekside Apartments, II LTD, authorized to make this declaration on behalf of said company.

12.     Lufkin Creekside Apartments II, LTD, owns a 60-unit multi-family property located at 1825 Sayers St., Lufkin, Texas 75904.

13. This multi-family property in Lufkin is a Low-Income Housing Tax Credit property that requires all residents to pass income eligibility requirements as part of the initial rental application process.

14. At least one tenant at the Center property referenced above is delinquent on rent.

15. Multiple tenants at the Lufkin property referenced above are delinquent on their rent.

16. At least one of those tenants that are delinquent on their rent at the Lufkin property have presented us with declarations that appear to substantially conform to those described in the CDC's emergency agency order *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 85 Fed. Reg. 55292 (Sept. 4, 2020).

17. Were it not for being presented with the declaration(s) referenced above, Lufkin Creekside Apartments II, LTD, would seek to utilize the procedures set forth in the Texas Property Code to evict those tenants that are delinquent on their rent.

18. Both the Center property and the Lufkin property referenced above have been maintained in compliance with all the property owner's legal obligations as landlord and those tenants that owe past due rent possess no other defense for nonpayment.

19. Because both the Center property and the Lufkin property referenced above are Low-Income Housing Tax Credit properties, there is a substantial risk that tenants that fall behind on their rental payments will neither be able to cure the delinquency nor own nonexempt assets sufficient to satisfy a legal judgment for damages.

20. Pineywoods Arcadia Home Team, LTD, has a mortgage on the Center property referenced above and makes monthly payments of approximately $3,745 for the mortgage principle and interest.

21.     Lufkin Creekside Apartments II, LTD, has a mortgage on the Lufkin property referenced above and makes monthly payments of approximately $13,352 for the mortgage principle and interest.

22.     Both Pineywoods Arcadia Home Team, LTD, and Lufkin Creekside Apartments II, LTD, rely on monthly rental income to timely make the mortgages payments on their respective properties.

23.     Were either company to default on its mortgage obligations, the resulting foreclosure on that company's mortgaged property would irreparably harm the company.

24.     Foreclosure would also constitute a non-compliance event as well as a reportable event to the Internal Revenue Service, likely negatively affecting each entity's ability to build Low-Income Housing Tax Credit properties in the future.

Pursuant to 28 U.S.C. § 1746, I, Carol C. Moore, declare under penalty of perjury that the foregoing is true and correct. Executed on this ___18th___ day of October, 2020, in Lufkin, Texas.


_____
Carol C. Moore

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | |
|---|---|
| LAUREN TERKEL; PINEYWOODS ARCADIA HOME TEAM, LTD; LUFKIN CREEKSIDE APARTMENTS, LTD; LUFKIN CREEKSIDE APARTMENTS II, LTD; LAKERIDGE APARTMENTS, LTD; WEATHERFORD MEADOW VISTA APARTMENTS, LP; and MACDONALD PROPERTY MANAGEMENT, LLC; <br><br> *Plaintiffs,* <br><br> v. <br><br> CENTERS FOR DISEASE CONTROL AND PREVENTION; ROBERT R. REDFIELD, in his official capacity as Director of the Centers for Disease Control and Prevention; NINA WITKOFSKY, in her official capacity as Acting Chief of Staff for the Centers for Disease Control and Prevention; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ALEX AZAR, in his official capacity as Secretary of the Department of Health and Human Services; <br><br> *Defendants.* | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § CIVIL ACTION NO. _____ <br> § <br> § JUDGE _____ <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

## DECLARATION OF JERRY D. MOORE

I, Jerry D. Moore, hereby declare as follows:

1.      I am over the age of eighteen (18), of sound mind, and capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.      I am the President of First MT Development Corporation, a for-profit corporation incorporated in the State of Texas and based in the City of Lufkin in Angelina County, Texas.

3.     First MT Development Corporation is a General Partner for Lufkin Creekside Apartments, LTD, which is a named plaintiff in this case.

4.     Lufkin Creekside Apartments, LTD, is a Texas limited partnership based in the City of Lufkin in Angelina County, Texas.

5.     I am a representative of the Lufkin Creekside Apartments, LTD, authorized to make this declaration on behalf of said company.

6.     Lufkin Creekside Apartments, LTD, owns a 72-unit multi-family property located at 1825 Sayers St., Lufkin, Texas 75904.

7.     This multi-family property in Lufkin is a Low-Income Housing Tax Credit property that requires all residents to pass income eligibility requirements as part of the initial rental application process.

8.     I am a Member of Shannock Two, LLC, a Texas limited liability company based in the City of Lufkin in Angelina County, Texas.

9.     Shannock Two, LLC, is the Managing General Partner in Lakeridge Apartments, LTD, which is a named plaintiff in this case.

10.     Lakeridge Apartments, LTD, is a Texas limited partnership based in the City of Lufkin in Angelina County, Texas.

11.     I am a representative of Lakeridge Apartments, LTD, authorized to make this declaration on behalf of said company.

12.     Lakeridge Apartments, LTD, owns a 112-unit multi-family property located at 3708 S. Lake Dr., Texarkana, Texas 75501.

13.     This multi-family property in Texarkana is a Low-Income Housing Tax Credit property that requires all residents to pass income eligibility requirements as part of the initial rental application process.

14.     Multiple tenants at both the Lufkin property and the Texarkana property referenced above are delinquent on their rent.

15.     Some of those tenants that are delinquent on their rent have presented us with declarations that appear to substantially conform to those described in the CDC's emergency agency order *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 85 Fed. Reg. 55292 (Sept. 4, 2020).

16.     Were it not for being presented with the declarations referenced above, both Lufkin Creekside Apartments, LTD, and Lakeridge Apartments, LTD, would seek to utilize the procedures set forth in the Texas Property Code to evict those tenants that are delinquent on their rent.

17.     Both the Lufkin property and the Texarkana property referenced above have been maintained in compliance with all the property owner's legal obligations as landlord and those tenants that owe past due rent possess no other defense for nonpayment.

18.     Because both the Lufkin property and the Texarkana property referenced above are Low-Income Housing Tax Credit properties, there is a substantial risk that tenants that fall behind on their rental payments will neither be able to cure the delinquency nor own nonexempt assets sufficient to satisfy a legal judgment for damages.

19.     Lufkin Creekside Apartments, LTD, has a mortgage on the Lufkin property referenced above and makes monthly payments of approximately $20,550 for the mortgage principle and interest.

20. Lakeridge Apartments, LTD, has a mortgage on the Texarkana property referenced above and makes monthly payments of approximately $34,944 for the mortgage principle and interest.

21. Both Lufkin Creekside Apartments, LTD, and Lakeridge Apartments, LTD, rely on monthly rental income to timely make the mortgages payments on their respective properties.

22. Were either company to default on its mortgage obligations, the resulting foreclosure on that company's mortgaged property would irreparably harm the company.

23. Foreclosure would also constitute a non-compliance event as well as a reportable event to the Internal Revenue Service, likely negatively affecting each entity's ability to build Low-Income Housing Tax Credit properties in the future.

Pursuant to 28 U.S.C. § 1746, I, Jerry D. Moore, declare under penalty of perjury that the foregoing is true and correct. Executed on this 18 day of October, 2020, in Lufkin, Texas.

Jerry D. Moore

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| LAUREN TERKEL; PINEYWOODS ARCADIA HOME TEAM, LTD; LUFKIN CREEKSIDE APARTMENTS, LTD; LUFKIN CREEKSIDE APARTMENTS II, LTD; LAKERIDGE APARTMENTS, LTD; WEATHERFORD MEADOW VISTA APARTMENTS, LP; and MACDONALD PROPERTY MANAGEMENT, LLC; | § § § § § § § § § | |
| *Plaintiffs,* | § § | CIVIL ACTION NO. _____ |
| v. | § § | JUDGE _____ |
| CENTERS FOR DISEASE CONTROL AND PREVENTION; ROBERT R. REDFIELD, in his official capacity as Director of the Centers for Disease Control and Prevention; NINA WITKOFSKY, in her official capacity as Acting Chief of Staff for the Centers for Disease Control and Prevention; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ALEX AZAR, in his official capacity as Secretary of the Department of Health and Human Services; | § § § § § § § § § § § § § § | |
| *Defendants.* | § | |

**DECLARATION OF JUSTIN MACDONALD**

I, Justin MacDonald, hereby declare as follows:

1.      I am over the age of eighteen (18), of sound mind, and capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.      I am the Sole Member of Weatherford Meadow Vista GP, LLC, a Texas limited liability company based in the City of Kerrville in Kerr County, Texas.

3.       Weatherford Meadow Vista GP, LLC, is a General Partner for Weatherford Meadow Vista Apartments, LP, a limited partnership in the state of Texas, which is a named plaintiff in this case.

4.       I am a representative of Weatherford Meadow Vista Apartments, LP, and am authorized to make this declaration on behalf of said company.

5.       Weatherford Meadow Vista Apartments, LP, owns an 80-unit multi-family property located at 525 Meadow Vista Circle, Weatherford, Texas 76087.

6.       Weatherford Meadow Vista Apartments, LP, has a mortgage on the Weatherford property and makes monthly payments of approximately $10,063 for the mortgage principle and interest.

7.       The additional monthly operating costs for the Weatherford property are approximately $32,036 including but not limited to staffing costs, utility obligations, maintenance costs, and property tax payments.

8.       Weatherford Meadow Vista Apartments, LP, relies on monthly rental income to timely make the mortgages payments on the Weatherford property.

9.       Were Weatherford Meadow Vista Apartments, LP, to default on its mortgage obligations, the resulting foreclosure on that company's mortgaged property would irreparably harm the company.

10.       This multi-family property in Weatherford is a Low-Income Housing Tax Credit property that requires all residents to pass income eligibility requirements as part of the initial rental application process.

11.       Because the Weatherford property is a Low-Income Housing Tax Credit property, there is a substantial risk that tenants that fall behind on their rental payments will neither be able

to cure the delinquency nor own nonexempt assets sufficient to satisfy a legal judgment for damages.

12.     The Weatherford property has been maintained in compliance with all the property owner's legal obligations as landlord.

13.     Foreclosure on the Weatherford property would constitute a non-compliance event as well as a reportable event to the Internal Revenue Service, likely negatively affecting each entity's ability to build Low-Income Housing Tax Credit properties in the future.

14.     I am also a Director and Manager for MacDonald Property Management, LLC, a Texas limited liability company based in the City of Kerrville in Kerr County, Texas, that is a named plaintiff in this case.

15.     Pursuant to my position as Director and Manager, I am a representative of MacDonald Property Management, LLC, and authorized to make this declaration on behalf of said company.

16.     MacDonald Property Management, LLC, manages 41 properties across the state of Texas.

17.     Multiple properties under the management of MacDonald Property Management, LLC, feature tenants that are more than one month delinquent on their rent.

18.     Some of those tenants that are delinquent on their rent have presented us with declarations that appear to substantially conform to those described in the CDC's emergency agency order *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 85 Fed. Reg. 55292 (Sept. 4, 2020).

19.     The properties managed by MacDonald Property Management, LLC, have been maintained in compliance with all the property owner's legal obligations as landlord and those

tenants that owe past due rent and have submitted the above described declarations possess no other defense for nonpayment

20.     The income for MacDonald Property Management, LLC, is primarily based upon receiving a percentage of the revenue from each property that it manages.

21.     The reduced collection of rental receipts has thus resulted in decreased revenues for those managed properties, which in turn has decreased the income of MacDonald Property Management, LLC.

22.     The increase in tenants not paying rent at the properties it manages has materially harmed the ability of MacDonald Property Management, LLC, to meet its financial obligations.

23.     However, while the income received by MacDonald Property Management, LLC, has decreased since the issuance of the CDC's order, its expenses for managing its properties have largely remained the same.

24.     Were it not for being presented with the declarations referenced above, MacDonald Property Management, LLC, would seek to utilize the procedures set forth in the Texas Property Code to evict those tenants that are delinquent on their rent on behalf of the properties it manages.

Pursuant to 28 U.S.C. § 1746, I, Justin MacDonald, declare under penalty of perjury that the foregoing is true and correct. Executed on this __21st__ day of October, 2020, in Kerrville, Texas.

_____
Justin MacDonald