# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

LAUREN TERKEL, *et al.*,

    Plaintiffs,

       v.

CENTERS FOR DISEASE CONTROL AND
PREVENTION, *et al.*,

    Defendants.

Case No. 6:20-cv-564-JCB

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

   I.   Statutory and Regulatory Background ................................................................... 2

   II.   The COVID-19 Pandemic ...................................................................................... 4

   III.  The CDC Order ...................................................................................................... 6

   IV.  Plaintiffs' Claims .................................................................................................... 9

ARGUMENT ............................................................................................................................. 9

   I.   Plaintiffs Are Not Entitled to Extraordinary Injunctive Relief. ............................ 9

      A.   Plaintiffs Have Not Shown Irreparable Injury. .............................................. 10

      B.   Plaintiffs Have Not Shown A Likelihood of Success on the Merits. ............... 14

          1.   The Order Regulates Economic Activity that Substantially Affects Interstate Commerce. ................................................................................... 14

              a.   Binding precedent establishes that the activity regulated here substantially affects interstate commerce. .......................................... 16

              b.   The *Lopez/Morrison* factors demonstrate that the activity regulated here substantially affects interstate commerce ................................................. 20

          2.   There Is No Basis to Conclude that the Order is Not "Proper." .................... 26

      C.   The Injunction Plaintiffs Seek Is Contrary to the Public Interest ..................... 27

   II.   Any Relief Granted Should Be Narrowly Tailored. ............................................... 29

CONCLUSION ........................................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**

*Ainsworth v. Moffett Eng'g, Ltd.,*
716 F.3d 174 (5th Cir. 2013) .................................................................................................27

*Am. Stewards of Liberty v. Dep't of the Interior,*
370 F. Supp. 3d 711 (W.D. Tex. 2019) ....................................................................... 15, 26

*Aspen Tech., Inc. v. M3 Tech., Inc.,*
569 Fed. App'x 259 (5th Cir. 2014) ........................................................................................12

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.,*
875 F.2d 1174 (5th Cir. 1989) .................................................................................................12

*Auracle Homes, LLC v. Lamont,*
No. 20-829, 2020 WL 4558682 (D. Conn. Aug. 7, 2020) ..............................................28

*Barber v. Bryant,*
860 F.3d 345 (5th Cir. 2017) .................................................................................................29

*Bouchard Transp. Co. v. Dep't of Homeland Sec.,*
No. 20-1116, 2020 WL 1689869 (E.D. La. Apr. 7, 2020) ..............................................11

*Brown v. Azar,*
No. 20-3702, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020) ......................................*passim*

*California v. Trump,*
267 F.Supp.3d 1119 (N.D. Cal. 2017) ...................................................................................14

*Deerfield Med. Ctr. v. Deerfield Beach,*
661 F.2d 328 (5th Cir. 1981) .................................................................................................11

*Def. Distributed v. U.S. Dep't of State,*
838 F.3d 451 (5th Cir. 2016) .................................................................................................10

*Dennis Melancon, Inc. v. City of New Orleans,*
703 F.3d 262 (5th Cir. 2020) ......................................................................................... 12, 13

*Distributed v. U.S. Dep't of State,*
838 F.3d 451 (5th Cir. 2016) .................................................................................................10

*Elmsford Apt. Assocs., LLC v. Cuomo,*
No. 20-4062, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) ......................................... 11, 12

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
762 F.2d 464 (5th Cir. 1985) .................................................................................................10

*Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Ed. & Welfare,*
601 F.2d 199 (5th Cir. 1979) ............................................................10

*GDF Realty Investments v. Norton,*
326 F.3d 622 (5th Cir. 2003) ........................................ 21, 22, 23, 25

*Gill v. Whitford,*
138 S. Ct. 1916 (2018) ......................................................................30

*Gonzales v. Raich,*
545 U.S. 1 (2005) ........................................................................*passim*

*Griffin v. Box,*
910 F.2d 255 (5th Cir. 1990) ............................................................10

*Groome Resources Ltd. v. Parish of Jefferson,*
234 F.3d 192 (5th Cir. 2000) ......................................................*passim*

*Heart of Atlanta Motel, Inc. v. United States,*
379 U.S. 241 (1964) ..........................................................................23

*Holland v. Nat'l Mining Ass'n,*
309 F.3d 808 (D.C. Cir. 2002) ........................................................30

*House the Homeless, Inc. v. Widnall,*
94 F.3d 176 (5th Cir. 1996) ..............................................................9

*Humana, Inc. v. Jacobson,*
804 F.2d 1390 (5th Cir. 1986) ........................................................11

*Indep. Turtle Farmers of La., Inc. v. United States,*
703 F. Supp. 2d 604 (W.D. La. 2010) ....................................... 20, 23

*Jones v. United States,*
529 U.S. 848 (2000) .................................................................... 16, 17

*Jordan v. Fisher,*
813 F.3d 216 (5th Cir. 2016) ............................................................10

*Jordan v. Fisher,*
823 F.3d 805 (5th Cir. 2016) ..............................................................9

*Lake Charles Diesel, Inc., v. Gen. Motors Corp.,*
328 F.3d 192 (5th Cir. 2003) ..................................................... 10, 14

*Lambert v. Bd. of Commissioners of Orleans Levee Dist.,*
No. CV 05-5931, 2006 WL 8456316 (E.D. La. Mar. 22, 2006) ........11

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer,*
  814 F. App'x 125 (6th Cir. 2020) ............................................................28

*Louisiana v. Mathews,*
  427 F. Supp. 174 (E.D. La. 1977) ...................................................... 20, 23

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ..........................................................................29

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ..........................................................................30

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.,*
  334 U.S. 219 (1948) ..........................................................................14

*Markle Interests, LLC v. United States Fish & Wildlife Serv.,*
  827 F.3d 452 (5th Cir. 2016) ..............................................................15

*Markle Interests, LLC v. United States Fish & Wildlife Serv.,*
  139 S. Ct. 590 (2018) ........................................................................15

*Martinez v. Mathews,*
  544 F.2d 1233 (5th Cir. 1976) ............................................................10

*Maryland v. Wilson,*
  519 U.S. 408 (1997) ..........................................................................15

*Matrix Partners VIII, LLP v. Natural Res. Recovery, Inc.,*
  No. 08-547, 2009 WL 175132 (E.D. Tex. Jan. 23, 2009) .......................9

*Milena Ship Mgmt. Co. v. Newcomb,*
  804 F. Supp. 846 (E.D. La. 1992) .......................................................10

*Morgan v. Sec'y of HUD,*
  985 F.2d 1451 (10th Cir. 1993) ..........................................................17

*NFIB v. Sebelius,*
  567 U.S. 519 (2012) ..........................................................................26

*Nken v. Holder,*
  556 U.S. 418 (2009) ..........................................................................27

*Oxford House-C v. City of St. Louis,*
  77 F.3d 249 (8th Cir. 1996) ...............................................................17

*Roman Catholic Diocese of Brooklyn, New York v. Cuomo,*
  No. 20-4844, 2020 WL 6120167 (E.D.N.Y. Oct. 16, 2020) ..................29

*Russell v. United States,*
   471 U.S. 858 (1985) ................................................................ 16, 18, 20, 26

*Sampson v. Murray,*
   415 U.S. 61 (1974) ................................................................................12

*Seniors Civil Liberties Ass'n v. Kemp,*
   965 F.2d 1030 (11th Cir. 1992) ........................................................18

*Smith v. Turner,*
   48 U.S. 283 (1849) ..............................................................................2

*Talleywhacker, Inc. v. Cooper,*
   No. 20-218, 2020 WL 3051207 (E.D.N.C. June 8, 2020) ................28

*Teladoc, Inc. v. Texas Med. Bd.,*
   112 F. Supp. 3d 529 (W.D. Tex. 2015) ............................................12

*Texas v. United States,*
   945 F.3d 355 (5th Cir. 2019) ............................................................26

*Tigges v. Northam,*
   No. 20-410, 2020 WL 4197610 (E.D. Va. July 21, 2020) ............28, 29

*TJM 64, Inc. v. Harris,*
   No. 20-2398, 2020 WL 4352756 (W.D. Tenn. July 29, 2020) ............28

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ......................................................................30

*United States v. Bird,*
   124 F.3d 667 (5th Cir. 1997) ............................................................15

*United States v. Corona,*
   108 F.3d 565 (5th Cir. 1997) ............................................................17

*United States v. Ho,*
   311 F.3d 589 (5th Cir. 2002) ................................................21, 22, 25

*United States v. Knutson,*
   113 F.3d 27 (5th Cir. 1997) ..............................................................16

*United States v. Lopez,*
   514 U.S. 549 (1995) ..............................................................15, 16, 27

*United States v. Morrison,*
   529 U.S. 598 (2000) ..............................................................20, 21, 26

*United States v. Nguyen,*
117 F.3d 796 (5th Cir. 1997) .................................................................17

*United States v. Robinson,*
119 F.3d 1205 (5th Cir. 1997) ...............................................................24

*United States v. Spann,*
No. 12-126, 2012 WL 4341799 (N.D. Tex. Sept. 24, 2012)
*aff'd*, 562 F. App'x 237 (5th Cir. 2014) ...............................................26

*United States v. Whaley,*
577 F.3d 254 (5th Cir. 2009) .................................................................15

*Watchguard Techs., Inc. v. Valentine,*
433 F. Supp. 2d 792 (N.D. Tex. 2006) .................................................10

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
139 S. Ct. 361 (2018) .............................................................................15

*Whole Woman's Health v. Paxton,*
972 F.3d 649 (5th Cir. 2020) .................................................................26

*Wickard v. Filburn,*
317 U.S. 111 (1942) ...............................................................................15

*Winter v. Natural Res. Def. Council,*
555 U.S. 7 (2008) .....................................................................................9

**Statutes**

42 U.S.C. § 264 ..................................................................................*passim*

Pub. L. No. 96-88, 93 Stat. 695 (Oct. 17, 1979) .....................................3

CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020) ...........5

**Legislative Materials**

Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) ....................................2

Act of Feb. 25, 1799, ch. 12, 1 Stat. 619 (1799) ....................................2

Act. of Feb. 15, 1893, ch. 114, 27 Stat. (1893) ......................................2

H.R. Rep. No. 78-1364 (1944) ................................................................3

New York Tenant Safe Harbor Act, 2020 N.Y. Sess. Laws (McKinney), S.8192B/A.10290B (June 30, 2020) ..................................................................................................6

## Regulations

42 C.F.R. § 70.2 .............................................................................................................. 4, 6, 24

31 Fed. Reg. 8855 (June 25, 1966) ...................................................................................... 3

85 Fed. Reg. 15337 (Mar. 13, 2020) ................................................................................... 4

85 Fed. Reg. 55292 (Sept. 4, 2020) ........................................................................... *passim*

## Other Authorities

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013) ................................................................................................................... 12

## INTRODUCTION

These are extraordinary times. The United States is affected by a global pandemic, during which the respiratory disease COVID-19 has infected tens of millions worldwide and resulted in the death of more than 235,000 people within our borders. *See* Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292, 55292 (Sept. 4, 2020). The disease spreads easily between persons within close contact (approximately six feet) via respiratory droplets. *Id.* It can cause severe illness but may also be transmitted by persons who are pre-symptomatic or asymptomatic—meaning that infected persons have the potential to infect others unknowingly. *Id.* Despite drastic measures by federal, state, and local government entities, including border closures, stay-at-home orders, mask mandates, and travel restrictions, COVID-19 continues to spread. *Id.*

In light of these rare circumstances, the Centers for Disease Control and Prevention (CDC) has exercised its authority under the Public Health Service Act (PHSA) and its implementing regulations to order a temporary halt in residential evictions to prevent the further spread of COVID-19 (the Order). *Id.* CDC found that this moratorium is an effective public health measure because, among other things, it facilitates self-isolation by ill and at-risk persons, eases implementation of stay-at-home and social distancing measures, and decreases the likelihood that persons will experience homelessness or move in to congregate settings, such as crowded shelters, both of which increase the risk of COVID-19 spread. *Id.* at 55295–96. The Order protects some of society's most vulnerable: low-income persons who have lost work or incurred extraordinary medical bills, have made every effort to pay their rent, and would not have available housing options if evicted. *Id.* at 55297. It does not excuse any tenant's obligation to pay rent or impair any landlord's ability to impose fees, interest, or other penalties short of eviction. *Id.* at 55292. Nor does it prevent landlords from evicting tenants for reasons other than failure timely to pay rent, such as criminal activity or property damage. *Id.* at 55294.

Plaintiffs are several landlords who allege that the Order has prevented them from evicting tenants for nonpayment of rent. They seek emergency injunctive relief to invalidate the Order. But Plaintiffs cannot meet any of the elements required to qualify for such extraordinary relief. In particular, as two other federal district courts have found in denying preliminary injunctions seeking to enjoin the Order, there is no irreparable harm where a plaintiff's injury is monetary, and the mere incantation of constitutional harm cannot cure this defect. *See Tiger Lily LLC v. U.S. Dep't of Housing & Urban Dev.*, ECF No. 69, No. 20-2692, slip op. at 16–22, (W.D. Tenn. Nov. 6, 2020), Exhibit A; *Brown v. Azar*, No. 20-3702, 2020 WL 6364310, at *17–21 (N.D. Ga. Oct. 29, 2020). Moreover, Plaintiffs' claim that the Order exceeds the limitations of the Commerce Clause is contrary to binding Supreme Court and Fifth Circuit precedent. And the balance of the harms and public interest overwhelmingly favor the government, which is acting to protect the citizenry at large from a widespread, pervasive, and deadly disease, as opposed to the economic interests of a few. Finally, the relief Plaintiffs seek—invalidation of a nationwide order issued to protect public health during a global pandemic—is overbroad and disproportionate to their alleged injuries. For all of these reasons, as explained below, Plaintiffs' motion should be denied.

## BACKGROUND

### I.     Statutory and Regulatory Background

The federal government has a long history of acting to combat the spread of communicable disease. Congress enacted the first federal quarantine law in 1796 in response to a yellow fever outbreak, authorizing the President to direct federal officials to help states enforce quarantine laws. Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) (repealed 1799); *see Smith v. Turner*, 48 U.S. 283, 300 (1849). Following a subsequent yellow fever outbreak, Congress replaced this Act with a federal inspection system for maritime quarantines. Act of Feb. 25, 1799, ch. 12, 1 Stat. 619 (1799). And in 1893, Congress authorized the Secretary of the Treasury to adopt additional regulations to prevent the

introduction of disease into the United States or across state lines where the Secretary considered state or local regulation inadequate. Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893).

In 1944, Congress enacted the provision at issue here, section 361 of the PHSA, as part of a broader effort to consolidate and clarify existing public health laws. H.R. Rep. No. 78-1364, at 1 (1944). In section 361(a), Congress broadened the federal government's "basic authority to make regulations to prevent the spread of disease into this country or between the States." *Id.* at 24. For example, Congress removed references to specific diseases to provide federal health authorities flexibility to respond to new types of contagion and "expressly sanction[ed] the use of conventional public-health enforcement methods" by the government in disease-control efforts. *Id.* at 24–25.

The resulting statute, 42 U.S.C. § 264, authorizes the Secretary of Health and Human Services (HHS)[1] "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). Subsection (a) further clarifies that "[f]or purposes of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id.* Subsection (b) imposes specific limits on the Secretary's ability to "provide for the apprehension, detention, or conditional release of individuals"—a power not referenced in subsection (a)—permitting such impositions on a person's physical movement only for diseases

---

[1] Although the statute assigns authority to the Surgeon General, Reorganization Plan No. 3 of 1966 abolished the Office of the Surgeon General and transferred all statutory powers and functions of the Surgeon General to the Secretary of Health, Education, and Welfare, now the Secretary of HHS, 31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966), *see also* Pub. L. No. 96-88, § 509(b), October 17, 1979, 93 Stat. 695 (codified at 20 U.S.C. 3508(b)). The Office of the Surgeon General was re-established in 1987, but the Secretary has retained these authorities.

specified by Executive Order. *Id.* § 264(b). Subsections (c) and (d) set further limits on the detention of individuals. *See id.* § 264(c)–(d). The final subsection provides that the statute and any regulation adopted thereunder supersede state law "to the extent that such a provision conflicts with an exercise of Federal authority." *Id.* § 264(e).

The Secretary of HHS has promulgated regulations implementing these provisions and delegating their enforcement to CDC. *See* 42 C.F.R. pt. 70; 65 Fed. Reg. 49906, 49907 (Aug. 16, 2000). In particular, 42 C.F.R. § 70.2 provides the CDC Director (or his or her authorized representative) with discretion to take measures to control contagion. Specifically, where the CDC Director "determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases" between or among States, he is empowered to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." 42 C.F.R. § 70.2. These measures include, but are not limited to, "inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection." *Id.* Other regulations authorize CDC to limit interstate travel, *see id.* § 70.3, apprehend and detain persons, *id.* § 70.6, and conduct medical examinations, *id.* § 70.12, to control the spread of disease. The regulations additionally provide for penalties for violations of these regulations. *Id.* § 70.18.

## II.     The COVID-19 Pandemic

In December 2019, a novel coronavirus dubbed SARS-CoV-2 was first detected in Wuhan, Hubei Province, in the People's Republic of China. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15337 (Mar. 13, 2020). The virus causes a respiratory disease known as COVID-19. *Id.*

COVID-19 is a serious illness that spreads easily. Contracting COVID-19 poses a risk of "severe" respiratory illness, meaning that persons who have the disease may require hospitalization,

intensive care, or the use of a ventilator. 85 Fed. Reg. at 55292. Severe cases of COVID-19 may be fatal. *Id.* The likelihood of becoming severely ill is greater among certain vulnerable populations. *Id.* at 55295. CDC has cautioned that the virus that causes COVID-19 transmits "very easily and sustainably" between people within "close contact"—approximately six feet—of one another. *Id.* at 55293. Persons not displaying symptoms are capable of transmitting the virus. *Id.* at 55292.

From its origins in late 2019, COVID-19 spread quickly across the globe, including to the United States. *See* 85 Fed. Reg. at 15337. On January 31, 2020, the Secretary of HHS declared a public health emergency due to the rise in confirmed COVID-19 cases in this country. U.S. Dep't of Health & Human Servs., Determination that a Public Health Emergency Exists (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx. On March 11, 2020, the World Health Organization classified the COVID-19 epidemic as a pandemic due to the increase in infections throughout the world, including in the United States. 85 Fed. Reg. at 15337. On March 13, 2020, the President declared the COVID-19 outbreak a national emergency. *Id.* By late August 2020 the virus had spread to all 50 states. *Id.* at 55292. To date, it has infected nearly ten million and caused the death of over 235,000 persons within the United States. *See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last visited Nov. 9, 2020). New cases continue to be reported daily, *see id.*, and CDC has called COVID-19 "a historic threat to public health," 85 Fed. Reg. at 55294.

To combat the spread of this easily transmitted, widespread, and potentially deadly virus, governments at all levels have taken "unprecedented or exceedingly rare actions" in the interest of protecting the public health. *Id.* These include border closures, travel restrictions, stay-at-home orders, and mask requirements. *Id.* In March 2020, Congress provided a 120-day moratorium on eviction filings based on nonpayment of rent, as well as other protections, to tenants residing in certain federally financed rental properties. CARES Act, Pub. L. No. 116-136, § 4024, 134 Stat. 281 (Mar. 27,

2020).  Although this measure temporarily helped mitigate the public health effects of tenant displacement during the pandemic, it expired on July 24, 2020.  85 Fed. Reg. at 55294.  And while certain states implemented their own temporary eviction moratoria, *see, e.g.*, New York Tenant Safe Harbor Act, 2020 N.Y. Sess. Laws (McKinney), S.8192B/A.10290B (Jun. 30, 2020), some such measures have also begun to expire, *see* 85 Fed Reg. at 55296 n.36.  Other states provided no separate protection for renters during the pandemic.  *Id.*

## III.    The CDC Order

In light of these circumstances, on September 4, 2020, CDC issued an Order under 42 U.S.C. § 264(a) and 42 C.F.R. § 70.2 providing for a temporary halt on residential evictions until December 31, 2020.  85 Fed. Reg. at 55292.  The agency found this moratorium "a reasonably necessary measure . . . to prevent the further spread of COVID-19," and that state and local measures that did not meet or exceed its protections were insufficient to prevent interstate spread.  *Id.* at 55296.

CDC determined that eviction moratoria help reduce the risk of transmission of COVID-19. *Id.* at 55294.  They do so by facilitating self-isolation for sick and high-risk persons, easing implementation of stay-at-home orders and social distancing measures, reducing the need for congregate housing, and helping to prevent homelessness.  *Id.*

As CDC explained, evictions present a public health concern because the movement of evicted renters could lead to "multiple outcomes that increase the risk of COVID-19 spread."  *Id.*  First, evicted renters are likely to move in with friends or family, leading to potential household crowding with new sources of infection.  *Id.*  This increases the risk of spreading COVID-19 because "transmission occurs readily within households," and "household contacts are estimated to be 6 times more likely to become infected by an index case of COVID-19 than other close contacts."  *Id.*

Second, the risk of transmission in shared housing increases exponentially if evicted persons move into congregate settings, such as homeless shelters, transitional housing, or domestic violence

shelters. *Id.* Maintaining social distance may be difficult in these settings, especially where residents must share small spaces, like stairwells and elevators, or equipment, such as kitchen or laundry facilities. *Id.* Indeed, "[e]xtensive outbreaks of COVID-19 have been identified in homeless shelters," including in Seattle, Boston, and San Francisco. *Id.* at 55295. These public health risks "may increase seasonally" as persons experiencing homelessness seek shelter in colder months. *Id.* at 55296.

Finally, evicted persons may experience unsheltered homelessness, which places them at "higher risk for infection when there is community spread of COVID-19." *Id.* at 55295. Their vulnerability to COVID-19 is higher due to exposure to the elements, as well as inadequate access to hygiene, sanitation, and healthcare. *Id.* The risk of unsheltered homelessness has increased during the pandemic, where safety precautions at shelters have reduced their capacities. *Id.*

In addition, research suggests that persons who would be evicted and become homeless as a result "include many who are predisposed to developing severe disease from COVID-19." *Id.* For example, evicted persons are more likely to experience hypertension, an underlying condition associated with severe COVID-19. *Id.* And among patients with COVID-19, experiencing homelessness has been associated with an increased likelihood of hospitalization. *Id.* at 55296.

These negative public health consequences could become enormous if evictions were to proceed unchecked during the pandemic. *Id.* at 55294–95. Research suggests that as many as 30 to 40 million people in the United States could be at risk of eviction in the absence of state and local protections. *Id.* at 55295. "A wave of evictions on that scale would be unprecedented in modern times." *Id.* Given that approximately 15 percent of moves each year are estimated to be interstate, "mass evictions would likely increase the interstate spread of COVID-19." *Id.*

CDC thus determined that it was reasonably necessary to prevent the interstate spread of COVID-19 to order that "a landlord . . . shall not evict any covered person from any residential property in any State . . . that provides a level of public-health protections below the requirements

listed in [the] Order." *Id.* at 55296. To qualify as "covered persons," tenants must certify under penalty of perjury that they have (1) used best efforts to obtain government assistance to make rental payments; (2) expect to earn less than $99,000 (or $198,000 if filing a joint tax return) in annual income in 2020, were not required to pay income taxes in 2019, or qualified for a stimulus check under the CARES Act; (3) are unable to pay full rent due to "substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses"; (4) are using best efforts to make partial payments; (5) would likely experience homelessness or need to move into a shared residence if evicted; (6) understand that rent obligations still apply; and (7) understand that the moratorium ends on December 31, 2020. *Id.* at 55297.

The Order does not alter a tenant's obligation to pay rent or comply with any other contractual obligation. *Id.* at 55294. It does not prevent the accrual or collection of fees, penalties, or interest under the terms of an applicable contract. *Id.* It also does not prevent evictions of persons who do not qualify as "covered persons," or evictions based on circumstances other than nonpayment of rent, including criminal activity, damage to property, or violation of contractual obligations other than the timely payment of rent. *Id.*

Following the Order's issuance, CDC provided further guidance regarding its operation. *See* CDC/HHS Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, Frequently Asked Questions, *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/ eviction-moratoria-order-faqs.pdf (FAQs). These FAQs confirm that the Order is "not intended to terminate or suspend the operations of any state or local court," *Id.* at 1. "The Order does not," for example, "preclude a landlord from challenging the truthfulness of a tenant's declaration in any state or municipal court." *Id.* at 6. "Nor is it intended to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order." *Id.* at 1.

## IV.    Plaintiffs' Claims

Plaintiffs are seven organizations or individuals, each of which claims to own or manage residential rental property in the state of Texas.  Compl. ¶¶ 1–7, ECF No. 1.  Each alleges that at least one tenant residing in property it owns or manages is delinquent in rent payments.  Pls.' Mem. in Supp. of Mot. for Prelim. Inj. (Pls.' Mem.) 5–7, ECF No. 3.  And all Plaintiffs but Meadow Vista assert that certain of these tenants have submitted declarations that appear to conform with the requirements of the CDC Order.  *See id.*  These Plaintiffs allege that but for the declarations, they would seek to evict the delinquent tenants.  *Id.*  Plaintiffs claim that the Order exceeds the federal government's Article I powers.  Compl. ¶¶ 70–97.

## ARGUMENT

Plaintiffs' motion for a preliminary injunction should be denied because they have not carried their burden to demonstrate any of the four elements necessary to warrant the extraordinary remedy of injunctive relief.

## I.    Plaintiffs Are Not Entitled to Extraordinary Injunctive Relief.

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  "The Fifth Circuit frequently cautions that . . . 'the decision to grant a preliminary injunction is to be treated as the exception rather than the rule.'"  *Matrix Partners VIII, LLP v. Natural Res. Recovery, Inc.*, No. 08-547, 2009 WL 175132, at *6 (E.D. Tex. Jan. 23, 2009) (alteration omitted) (quoting *House the Homeless, Inc. v. Widnall*, 94 F.3d 176, 180 (5th Cir. 1996)).  The party seeking a preliminary injunction bears the burden to show: (1) "a substantial threat of irreparable injury," (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest."  *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016).  A preliminary injunction should not be "granted unless the party seeking it has

clearly carried the burden of persuasion on all four requirements." *Jordan v. Fisher*, 813 F.3d 216, 221 (5th Cir. 2016) (citation omitted); *see also, e.g.*, *Lake Charles Diesel, Inc., v. Gen. Motors Corp.*, 328 F.3d 192, 203 (5th Cir. 2003) (if plaintiff fails to satisfy a single requirement, court "need not address the three remaining prongs of the test for granting preliminary injunctions"); *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (similar).[2]

The burden is even higher where, as here, the movant seeks an injunction that alters the status quo. *See Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). "[T]he central purpose of a preliminary injunction" is to "maintain[] the status quo." *Griffin v. Box*, 910 F.2d 255, 263 (5th Cir. 1990). Preliminary injunctions that go "well beyond simply maintaining the status quo" are "particularly disfavored[] and should not be issued unless the facts and law clearly favor the moving party." *Martinez*, 544 F.2d at 1243; *see also Milena Ship Mgmt. Co. v. Newcomb*, 804 F. Supp. 846, 853 (E.D. La. 1992).

### A. Plaintiffs Have Not Shown Irreparable Injury.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013). Plaintiffs bear a "heavy burden of clearly establishing to the Court irreparable harm." *Watchguard Techs., Inc. v. Valentine*, 433 F. Supp. 2d 792, 794 (N.D. Tex. 2006). To show irreparable harm, a party must demonstrate "a *significant threat* of injury

---

[2] Citing a single footnote in a decades-old decision, Plaintiffs contend that the Court may apply a sliding-scale approach, pursuant to which a stronger showing on one factor may overcome a weaker showing on another. *See* Pls.' Mem. 8 (citing *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979)). But more recent precedent makes clear that a movant must satisfy all four requirements, and "satisfying one requirement does not necessarily affect the analysis of the other requirements." *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 457 (5th Cir. 2016).

from the impending action, that the injury is *imminent*, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986) (emphases added). Here, Plaintiffs contend that irreparable harm arises "from both the constitutional injury this Order inflicts and the unrecoverable financial damages that are likely to result." Pls.' Mem. 25. Neither theory suffices. Indeed, two federal courts have denied motions for preliminary injunction for failure to show irreparable harm where plaintiffs asserted materially similar claims of harm arising from the Order. *See Tiger Lily*, slip op. at 16–22; *Brown*, 2020 WL 6364310, at *17–21.

First, Plaintiffs cite no Fifth Circuit authority for the proposition that irreparable harm is automatically established whenever a plaintiff contends that the federal government has acted beyond its enumerated powers. To the contrary, Plaintiffs' only Circuit authority suggests that violations of certain personal constitutional rights like speech and privacy can constitute irreparable harm. *See Deerfield Med. Ctr. v. Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (cited in Pls.' Mem. 25). As courts in this Circuit have explained, "[t]hat the nature of certain constitutional violations, such as violations of the freedoms of speech and privacy, is such that they necessarily cause irreparable harm does not, however, establish that any alleged constitutional violation does so." *Lambert v. Bd. of Commissioners of Orleans Levee Dist.*, No. CV 05-5931, 2006 WL 8456316, at *7 (E.D. La. Mar. 22, 2006); *see also, e.g. Bouchard Transp. Co. v. Dep't of Homeland Sec.*, No. 20-1116, 2020 WL 1689869, at *2 (E.D. La. Apr. 7, 2020) (similar). As two other federal courts recently explained in denying preliminary injunctions in similar challenges to the CDC Order, "[m]erely asserting a constitutional claim is insufficient to trigger a finding of irreparable harm," particularly where the alleged injury "involves neither free speech nor invasion of privacy." *Brown*, 2020 WL 6364310, at *18; *see also Tiger Lily*, slip op. at 20–22.

Second, Plaintiffs cannot satisfy their burden by contending that "any damages caused by lost rents will likely be unrecoverable." Pls.' Mem. 25. Indeed, nothing in the Order prevents Plaintiffs from suing their tenants for unpaid rent. *See Tiger Lily*, slip op. at 18; *see also Elmsford Apt. Assocs., LLC*

*v. Cuomo*, No. 20-4062, 2020 WL 3498456, at *15 (S.D.N.Y. June 29, 2020). The CDC Order "does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other [contractual] obligation." 85 Fed. Reg. at 55292. Nor does it "preclude[] the charging or collecting of fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis." *Id.* And "as a general rule," "a preliminary injunction is an inappropriate remedy where the potential harm to the movant is strictly financial." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989). Even economic injuries that are "substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Plaintiffs' basic contention is that this doctrine does not apply because it may be difficult to collect money judgments for unpaid rent entered against their tenants. *See* Pls.' Mem. 27. But the *certainty* of monetary relief is not required; even "the *possibility* that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2020) (emphasis added).[3]

In any event, Plaintiffs provide no reason beyond speculation to believe that no monetary judgment could be enforced against their tenants. As in *Brown*, Plaintiffs have provided no information whatsoever about "the occupation of any of the tenants, whether they are employed or unemployed (and, if unemployed, their prospect for reemployment), whether they are (or have been) sick, whether they have money in the bank, whether they qualify for some type of government assistance, whether they could obtain a loan to cover their rent or the nature of their credit histories." 2020 WL 6364310,

---

[3] The cases cited by Plaintiffs are entirely distinguishable. *See, e.g., Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 Fed. Appx. 259, 273 (5th Cir. 2014) (defendant had already initiated bankruptcy proceedings); *Teladoc, Inc. v. Texas Med. Bd.*, 112 F. Supp. 3d 529, 543 (W.D. Tex. 2015) (accepting evidence in declaration that individuals were unlikely to be able to pay damages running to tens of millions of dollars).

at *20. Nor do they indicate whether their tenants have any illiquid assets against which they might seek to enforce a money judgment. As explained in *Brown*, "although the tenants may not currently be able to afford their rent," that does not mean that "they will likely never be able to collect a judgment." 2020 WL 6364310, at *20. Indeed, tenants may become eligible for various government benefits, *id.*, or they may find employment in the future. Plaintiffs, however, offer no evidence to show that there is no "possibility that adequate compensatory or other corrective relief will be available at a later date," *Dennis Melancon, Inc.*, 703 F.3d at 279—and that "lack of evidence precludes a finding of irreparable harm," *Brown*, 2020 WL 6364310, at *20.

Moreover, the Order does not bar Plaintiffs from evicting their tenants forever; it merely postpones that remedy for a limited time in furtherance of urgent public health goals. *See Brown*, 2020 WL 6364310, at *16 ("[T]he Order is temporary; therefore, Plaintiffs' ability to evict their tenants is only merely delayed until it expires on December 31, 2020, unless extended, modified or rescinded."). As a court in the Southern District of Ohio recently explained in denying a landlord's motion for a temporary restraining order in a similar challenge, "Plaintiff has not demonstrated that enforcement of the CDC's Order will cause it irreparable harm," because the Order only "postpones Plaintiff's collection of debt until after its expiration." Order, *KBW Inv. Props. LLC v. Azar*, ECF No. 16, No. 20-4852 (S.D. Ohio Sept. 25, 2020), Exhibit B.

Finally, Plaintiffs contend that a delay in receiving rent "will affect Plaintiffs' options on what services to provide to their other paying tenants, whom to hire or fire, and how to operate their properties." Pls.' Mem. 27. Plaintiffs cite no case standing for the dubious proposition that mere delay in the receipt of money constitutes irreparable harm; indeed, such an assertion is squarely contrary to the clearly established principle that economic injuries alone are not irreparable. *See Brown*, 2020 WL 6364310, at *20 (denying preliminary injunction where "the passage of time alone may repair Plaintiffs' injuries"). The only case that Plaintiffs cite on this point, which rejected a finding of

irreparable harm in the course of denying a preliminary injunction, certainly offers this theory no support. *See California v. Trump*, 267 F.Supp.3d 1119, 1133 (N.D. Cal. 2017) (cited in Pls.' Mem. 28).

Plaintiffs have thus failed to demonstrate irreparable harm. This deficiency alone requires denial of their motion for preliminary injunction. *See, e.g.*, *Lake Charles Diesel*, 328 F.3d at 203; *accord Tiger Lily*, slip op. at 22 (holding that lack of irreparable harm was sufficient to deny preliminary injunction); *Brown*, 2020 WL 6364310, at *21 (same).

### B. Plaintiffs Have Not Shown A Likelihood of Success on the Merits.

Plaintiffs have also failed to fulfill their burden to show a likelihood of success on the merits. They argue that the CDC Order allegedly exceeds the federal government's constitutional authority under Article I, Section 8, asserting that the Order is permissible under neither the Commerce Clause nor the Necessary and Proper Clause. *See* Pls.' Mem. 10–24. But Plaintiffs are incorrect: the Order falls squarely within the scope of the federal government's authority to regulate interstate commerce, which is sufficient under the Constitution without resort to the Necessary and Proper Clause.

#### 1. The Order Regulates Economic Activity that Substantially Affects Interstate Commerce.

The Commerce Clause permits Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. It is well established that, under the Commerce Clause, Congress may regulate not only "the use of the channels of interstate commerce" and "the instrumentalities of interstate commerce, or persons or things in interstate commerce," but also "activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59 (1995); *see also* Pls.' Mem. 10. This includes "purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005); *see also, e.g.*, *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) (holding that the commerce power "may be exercised in individual cases without showing any specific effect upon interstate commerce; it is enough that the individual activity

when multiplied into a general practice is subject to federal control . . . or that it contains a threat to the interstate economy that requires preventive regulation"); *Wickard v. Filburn*, 317 U.S. 111, 125 (1942) ("even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce"); *United States v. Bird*, 124 F.3d 667, 676 (5th Cir. 1997) (noting that the Supreme Court in *Lopez* "expressly reaffirmed . . . the proposition set forth in *Wickard v. Filburn* concerning congressional regulation of intrastate, noncommercial activity").

To demonstrate that regulation is authorized under the Commerce Clause, the government need set forth only a "rational basis" for the conclusion "that a regulated activity sufficiently affected interstate commerce."[4] *Lopez*, 514 U.S. at 557; *see also Raich*, 545 U.S. at 22 ("We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding."). As such, "federal Commerce Clause

---

[4] Plaintiffs rely upon a concurring opinion as authority for the proposition that the Court should analyze the substantial effects test through the lens of the Necessary and Proper Clause. *See* Pls.' Mem. 10–11 & n.4 (citing Justice Scalia's concurrence in *Raich*). Concurrences do not "constitute[] binding precedent." *See, e.g.*, *Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997). And as another court within this Circuit recently observed in rejecting the same argument Plaintiffs advance here, "[t]he *majority* in *Raich* . . . analyzed the case under *Lopez* and *Morrison* and applied a rational-basis test in reviewing non-commercial intrastate activities that have a substantial effect on interstate commerce." *Am. Stewards of Liberty v. Dep't of the Interior*, 370 F. Supp. 3d 711, 733–35 (W.D. Tex. 2019), *appeal dismissed sub nom. Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223 (5th Cir. 2020). Any favorable reference to the reasoning in Justice Scalia's concurrence in the Fifth Circuit, *see United States v. Whaley*, 577 F.3d 254, 260 (5th Cir. 2009), does not indicate that this separate opinion has supplanted the majority's reasoning in this Circuit (nor could it). Instead, more recent Fifth Circuit decisions have continued to apply the majority opinions in *Lopez*, *Morrison*, and *Raich* in determining whether a rational basis existed for concluding that a regulated activity substantially affected commerce. *See Markle Interests, LLC v. United States Fish & Wildlife Serv.*, 827 F.3d 452, 475–76 (5th Cir. 2016), *vacated and remanded on other grounds sub nom. Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361 (2018), *and cert. granted, judgment vacated sub nom. Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 590 (2018). But even if the Court were to view this case through the lens of the Necessary and Proper Clause, the analysis contained herein applies, as Plaintiffs cite only Commerce Clause cases in arguing that the Order is not "necessary." *See* Pls.' Mem. 13–21.

legislation . . . merit[s] a high degree of judicial deference." *United States v. Knutson*, 113 F.3d 27, 29

(5th Cir. 1997). To be sure, there are "judicially enforceable outer limits" to this power. *Lopez*, 514

U.S. at 556. For example, the Supreme Court in *Lopez* held that no rational basis existed under the

Commerce Clause for criminalizing gun possession within a school zone where the statute had nothing

to do with economic activity, contained no jurisdictional element requiring a connection to interstate

commerce, was not supported by any congressional findings regarding the impact on interstate

commerce, and discerning any effect upon interstate commerce required an attenuated chain of

inferences. *See id.* at 561–67. But in recognizing these limits, Supreme Court "did not purport to

eliminate or erode well-established Commerce Clause precedents" or alter the standard of review.[5]

*Knutson*, 113 F.3d at 29.

<blockquote>

a. <u>Binding precedent establishes that the activity regulated here substantially affects interstate commerce.</u>

</blockquote>

The Supreme Court has expressly held that the "rental of real estate is unquestionably" an

activity affecting interstate commerce. *Russell v. United States*, 471 U.S. 858, 862 (1985) (rejecting

Commerce Clause challenge to federal arson conviction for attempting to set fire to apartment rental

units); *see also Jones v. United States*, 529 U.S. 848, 856 (2000) (reaffirming *Russell*). In *Russell*, the

petitioner was convicted for attempting to set fire to an apartment building under the federal arson

statute, which criminalizes destroying by fire "real or personal property used . . . in any activity affecting

interstate or foreign commerce." 471 U.S. at 860 (quoting 18 U.S.C. § 844(i)). In upholding the

conviction, the Court recognized that "the local rental of an apartment unit is merely an element of a

---

[5] To the extent Plaintiffs imply some heightened standard of "evidence-based, federalism-sensitive" rational basis review applies here, *see* Pls.' Mem. 13, that is inconsistent with controlling Supreme Court and Fifth Circuit precedent, *see, e.g.*, *Raich*, 545 U.S. at 22; *Lopez*, 514 U.S. at 557 (courts' role is "to decide whether a rational basis existed for concluding a regulated activity sufficiently affected interstate commerce"); *Groome Resources Ltd. v. Parish of Jefferson*, 234 F.3d 192, 203 (5th Cir. 2000) ("the *Lopez* court reaffirmed the rational basis test by which we are bound to evaluate the constitutionality of congressional actions").

much broader commercial market in rental properties," and that "[t]he congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class." *Id.* at 862. Accordingly, because the "[p]etitioner was renting his apartment building to tenants," it was "being used in an activity affecting commerce." *Id.* Following *Russell*, the Fifth Circuit has consistently rejected Commerce Clause challenges to federal arson convictions where rental properties were affected. *See, e.g.*, *United States v. Nguyen*, 117 F.3d 796, 798 (5th Cir. 1997) (affirming conviction where explosion incidentally damaged apartment units); *United States v. Corona*, 108 F.3d 565, 571–72 (5th Cir. 1997) ("these convictions comport with the Commerce Clause because of the fact that the fire spread to . . . property actually being rented").

Following *Russell*, the Fifth Circuit has likewise held that not only is it "a transparently commercial action to buy, sell, or *rent* a house," but that "viewed in the aggregate, it implicates the entire commercial industry." *Groome Resources Ltd. v. Parish of Jefferson*, 234 F.3d 192, 206 (5th Cir. 2000) (emphasis added). In *Groome*, the plaintiff argued that a provision of the Fair Housing Amendments Act—which prohibits discrimination by requiring reasonable accommodations for disabled persons in the purchase, sale, or rental of housing—regulated activity that was not economic, and was therefore outside the commerce power. *Id.* at 202, 205. The court disagreed, noting that in *Russell*, *Jones*, and their progeny, "authority for regulation rested on the rental or commercial use of [a] property," and for that reason, those cases "support[ed] the conclusion that we are dealing with a commercial activity that falls within the purview of Congress's regulatory authority." *Id.* at 207–08. The court concluded that "the regulation of discriminatory policies in the purchase or rental of housing directly affects the housing industry and the economy," and that congressional action was permissible under the Commerce Clause. *Id.* at 215. Other circuits have likewise upheld Congress's determination that housing discrimination has a substantial effect on interstate commerce. *See, e.g.*, *Oxford House-C v. City of St. Louis*, 77 F.3d 249, 251 (8th Cir. 1996); *Morgan v. Sec'y of HUD*, 985 F.2d 1451, 1455 (10th Cir.

1993); *Seniors Civil Liberties Ass'n v. Kemp*, 965 F.2d 1030, 1034 (11th Cir. 1992).

CDC's Order similarly regulates the rental housing market, and under *Russell* and *Groome*, a rational basis exists for concluding that it substantially affects interstate commerce. On its face, the Order regulates the rental market for real estate, providing that "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action, shall not evict any covered person from any residential property in any jurisdiction to which this Order applies during the effective period of the Order." 85 Fed. Reg. at 55292. It specifically governs the contractual relationship between "any tenant, lessee, or resident of a residential property" who meets certain criteria and "their landlord, the owner of the residential property, or other person with a legal right to pursue eviction or a possessory action." *Id.* at 55293. Rental of residential real estate is "a transparently commercial action," *Groome*, 234 F.3d at 206, and the market for rental housing consists of economic relationships between landlords and tenants. Those economic relationships are governed by contractual agreements that generally require performance by both parties—i.e., landlords must provide habitable accommodations and tenants must pay rent. Either party may pursue remedies for a contractual breach, and the ability to seek an eviction order is often an available remedy for landlords. By temporarily delaying a landlord's ability to execute such an order to address a public health emergency, CDC is regulating numerous individual commercial relationships that, in the aggregate, comprise a nationwide market. *See Russell*, 471 U.S. at 862. It is thus engaging in regulation of economic activity that unquestionably affects interstate commerce. In light of *Russell*'s recognition of Congress's power "to regulate the class of activities that constitute the rental market for real estate," 471 U.S. at 862, the fact that the Order regulates landlord-tenant relationships in the interstate rental real estate market by temporarily restricting an otherwise available remedy for contractual breach for nonpayment is dispositive of the Commerce Clause question.

In addition to demonstrating the economic nature of the activity regulated, the Order makes

specific findings about the national implications of the eviction moratorium (or lack thereof) and its interstate effects. As an initial matter, one of the stated objectives of the Order is to "mitigat[e] the further spread of COVID-19 from one U.S. State or U.S. territory into any other U.S. State or U.S. territory." *Id.* at 55293. The Order further cites evidence that purely intrastate evictions, in the aggregate, affect the national rental housing market, explaining that "[i]n the absence of State and local protections, as many as 30–40 million people in America could be at risk of eviction." *Id.* at 55295. On top of ushering in a "wave of evictions . . . unprecedented in modern times," the absence of a temporary eviction moratorium "would likely increase the interstate spread of COVID-19," as "15% of moves are interstate" in a typical year, and that percentage extrapolated over a huge number of persons forced to move as a result of evictions would represent a significant amount of interstate movement. *Id.* And finally, the Order finds that measures by states or territories that "do not meet or exceed" the protections included in the Order "are insufficient to prevent the spread of COVID-19," pointing out that "eviction moratoria and other protections from eviction have expired or are set to expire in many jurisdictions." *Id.* at 55296 & n.36. These findings also show that a rational basis underlies the conclusion that the Order regulates activity that substantially affects interstate commerce.

Recognizing its significance, Plaintiffs attempt to distinguish *Groome* by arguing that the Order is of a different character than the regulation at issue there insofar as it "does not directly regulate commercial transactions." Pls.' Mem. 15–16. But it plainly does. The Order affects the commercial relationship between landlords and tenants by pausing evictions of "covered persons" solely for economic reasons—i.e., nonpayment of rent—in furtherance of urgent public health goals.[6] *See* 85

---

[6] The Order does not, as Plaintiffs contend, categorically prevent landlords from "remov[ing] individuals who are unlawfully present from their property." Pls.' Mem. 16. The Order applies only to a "tenant, lessee, or resident of a residential property" to whom a landlord has agreed to rent, and who qualifies as a "covered person," 85 Fed. Reg. at 55293, and it permits evictions of even covered persons for actions like criminal activity, property damage, or contractual breaches other than the nonpayment of rent, *id.* at 55294. Nor does the Order preclude landlords from "initiat[ing] state legal

Fed. Reg. at 55294.  Just as a failure to grant a reasonable accommodation "frustrated" and thereby "affected a commercial endeavor" in *Groome*, 234 F.3d at 208, the Order thus "directly affects the housing industry and the economy," *id.* at 215.  But even if it did not, Plaintiffs are incorrect that regulation is required to directly regulate a commercial transaction to fall within the commerce power. Instead, courts consider only whether a rational basis exists for determining that the activities regulated "taken in the aggregate, substantially affect interstate commerce." *Raich*, 545 U.S. at 22.  Indeed, it is clear that criminalization of setting fire to an apartment building, the activity considered in *Russell*, is not a *direct* regulation of a commercial transaction between a landlord and a tenant, but the Supreme Court nonetheless held that it fell within "[t]he congressional power to regulate the class of activities that constitute the rental market for real estate." 471 U.S. at 862.

 Finally, it bears emphasis that since the passage of the PHSA, no court has ever struck down a regulation issued under 42 U.S.C. § 264(a) for the purpose of preventing the spread of disease, on Commerce Clause or any other grounds.  *See Indep. Turtle Farmers of La., Inc. v. United States*, 703 F. Supp. 2d 604, 620–21 (W.D. La. 2010) (rejecting Commerce Clause challenge to regulation issued pursuant to the PHSA); *Louisiana v. Mathews*, 427 F. Supp. 174, 176 (E.D. La. 1977) (same).  And none of these regulations was issued in the face of such a grave public-health threat as the nation now faces.

Based on these considerations alone, the Court should conclude that Plaintiffs have not carried their burden to show their Commerce Clause challenge is likely to succeed.

> b. The *Lopez/Morrison* factors demonstrate that the activity regulated here substantially affects interstate commerce.

Plaintiffs point the Court to four factors suggested by the Supreme Court in *Lopez* and *United*

---

proceedings."  Pls.' Mem. 16.  As the FAQs explain, the Order "is not intended to terminate or suspend the operations of any state or local court" or "to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order."  FAQs at 1.

*States v. Morrison*, 529 U.S. 598 (2000), as guidance for determining whether a rational basis existed for the conclusion that the activity regulated here substantially affects interstate commerce. *See* Pls.' Mem. 13. Subsequent Supreme Court precedent establishes, however, that consideration of the *Lopez/Morrison* factors is unnecessary where, as here, clear precedent establishes that regulation of a class of activities is permissible under the Commerce Clause, and that those activities are "quintessentially economic." *See Raich*, 545 U.S. at 17–26. In *Raich*, the Court held that regulation of intrastate and noncommercial growth, possession, and consumption of marijuana was consistent with the Commerce Clause because (1) the activity regulated was very similar to the regulation of "home consumed wheat" in *Wickard v. Filburn*, and that, viewed "in the aggregate," leaving it outside the regulatory scheme "would have a substantial influence on price and market conditions," *id.* at 17–19; and (2) unlike in *Lopez* and *Morrison*, the activities regulated were economic in nature, *id.* at 25–26. The same logic applies here, where both the Supreme Court and the Fifth Circuit have determined that the regulation of even intrastate residential rental transactions has a substantial effect on interstate commerce, and that activity is quintessentially economic. The Court need look no further to conclude that Plaintiffs are unlikely to succeed on the merits.

But if it chooses to consider the four *Lopez/Morrison* factors relied upon in the pre-*Raich* Commerce Clause cases cited by Plaintiffs, it is nonetheless clear that Plaintiffs are unlikely to succeed on the merits, as each factor favors Defendants. *See, e.g.*, *United States v. Ho*, 311 F.3d 589, 599–601 (5th Cir. 2002); *Groome*, 234 F.3d at 204–05. The factors are: (1) the "economic nature of the regulated activity," *Groome*, 234 F.3d at 204 (quoting *Morrison*, 529 U.S. at 610); (2) whether the regulation contains a "jurisdictional element," *id.*; (3) the existence of findings as to the regulation's impact on interstate commerce, *id.*; and (4) "the attenuation of the link" between the regulated activity and interstate commerce, *GDF Realty Investments v. Norton*, 326 F.3d 622, 629 (5th Cir. 2003). These considerations are not prerequisites, but merely "factors" courts consider when determining whether

there is a rational basis for finding that a regulated activity has a substantial effect on interstate commerce. *See, e.g., Ho*, 311 F.3d at 603–04 (statutes criminalizing asbestos-related activities were permissible under the Commerce Clause despite having no jurisdictional element and no legislative findings regarding interstate commerce); *Groome*, 234 F.3d at 211–15 (similar).

Of the four *Lopez/Morrison* considerations, this Circuit has recognized that the "key question" is "whether the nature of the regulated activity is economic." *GDF Realty*, 326 F.3d at 630. As explained in detail above, the regulated activity here is economic in nature. The Fifth Circuit previously acknowledged in *Groome* the economic nature of the commercial market for residential rentals. 234 F.3d at 205–06 ("the commercial rental of housing . . . fits well within the broad definition of economic activity established by the Supreme Court and other circuits"). And the fact that the Order directly regulates the economic relationship between landlords and tenants by temporarily halting one remedy—evictions of "covered persons"—for the contractual breach of nonpayment of rent makes clear the economic character of the regulated activity.

Plaintiffs' attempt to portray the activity regulated here as noneconomic falls flat. They assert that an "eviction itself is not economic activity." Pls.' Mem. 14. But courts have rejected attempts to define a regulated activity so narrowly in analyzing whether it substantially affected interstate commerce. The plaintiff in *Groome*, for example, argued that Congress could not regulate discrimination because it is not economic activity, and the Fifth Circuit rejected that characterization, finding that the relevant activity was, instead, "the commercial rental of housing," which "fit[] well within the broad definition of economic activity established by the Supreme Court." 234 F.3d at 205–06. And the relevant inquiry was the effect of discrimination on that commercial endeavor. *See id.* at 207–08. Here, the temporary eviction moratorium plainly affects the commercial, contractual relationships between landlords and tenants on a national scale by limiting one of the remedies for breach of contract that a landlord would otherwise have in an existing economic relationship.

For these reasons, the activity regulated here is readily distinguishable from that in *GDF Realty*, upon which Plaintiffs rely. Pls.' Mem. 14. In that case, the court held that the regulated activity— "takes" of certain endangered species—was not commercial activity where the takes themselves were not economic in nature, even if the motivation underlying the takes was economic.[7] *GDF Realty*, 326 F.3d at 636. The opposite situation is presented here: the regulated activity is economic in nature, even if the motivation underlying it is not. *See* 85 Fed. Reg. at 55293 (Order's objectives include "[m]itigating the spread of COVID-19"). It is plain, however, that regulation intended to correct societal ills—like the spread of disease—is permissible under the Commerce Clause provided the requisite substantial effect on interstate commerce exists. *See, e.g., Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 257 (1964) (holding that regulations prohibiting racial discrimination in hotel accommodations were permissible under the Commerce Clause as a result of the "disruptive effect that racial discrimination has had on commercial intercourse"). Indeed, the few federal courts to have addressed the scope of 42 U.S.C. § 264 have held that a ban on intrastate sales of small turtles was authorized under the statute and the Constitution, finding that preventing sales within the same state was "not only authorized by the law, but, under modern conditions of transportation and commerce" was "clearly reasonable to prevent the interstate spread of disease." *Mathews*, 427 F. Supp. at 176; *see also Indep. Turtle Farmers*, 703 F. Supp. 2d at 620–21. So too here.

The next *Lopez/Morrison* factor is the existence of a jurisdictional element in the regulation. This consideration is primarily relevant in cases where there is "no obvious interstate economic connection," such as in cases involving "non-economic and intrastate activities." *Groome*, 234 F.3d

---

[7] The *GDF Realty* court went on to hold that the regulation was permissible under the Commerce Clause as necessary to ensure the efficacy of a larger economic regulatory scheme. 326 F.3d at 640. In fact, other than *Lopez* and *Morrison*, which are easily distinguishable, Plaintiffs fail to point to *any* case in which a court found no rational basis existed for concluding that a regulated activity had a substantial effect on interstate commerce. *See* Pls.' Mem. 12–21.

at 211.  Given the "explicit economic nature of commercial housing used for rental purposes," cases like this one "present[] a very different situation than cases challenging non-economic and non-commercial regulatory acts."  *Id.*; *see also United States v. Robinson*, 119 F.3d 1205, 1212 (5th Cir. 1997) ("Even in the absence of such a [jurisdictional] statutory requirement, we will uphold the challenged statute if the regulated conduct's connection to interstate commerce is manifest.").

Nevertheless, although the Order does not limit its application based on a connection to interstate commerce, both the statute and the regulation pursuant to which the Order was issued require disease-prevention measures enacted thereunder to further the goal of preventing the interstate (or international) spread of illness.  Specifically, 42 U.S.C. § 264(a) authorizes the HHS Secretary to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or *from one State or possession into any other State or possession*."  42 U.S.C. § 264(a) (emphasis added).  Likewise, 42 C.F.R. § 70.2 authorizes the CDC Director to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary" where the Director "determines that the measures taken by health authorities of any State . . . are insufficient to prevent the spread of any of the communicable diseases from such State or possession to any other State or possession."  In accordance with these jurisdictional requirements, the Order finds that state eviction moratoria that do not "meet or exceed" the Order' protections "are insufficient to prevent the interstate spread of COVID-19."  85 Fed. Reg. at 55296.  The Order also sets forth evidence that "mass evictions" on the scale expected to occur in the absence of state or local protections "would likely increase the interstate spread of COVID-19."  *Id.* at 55295.

These conclusions lead directly to the next factor:  the existence of findings regarding the regulated activity's effects on interstate commerce.  The Fifth Circuit has recognized that this is the "least important" of the four considerations, and that findings are "neither necessary nor sufficient,"

but only "helpful insofar as they aid the courts in identifying a substantial effect on commerce." *Ho*, 311 F.3d at 600. Regardless, as explained, CDC did include in the Order findings regarding the potential interstate effects of the eviction moratorium—and the negative consequences that could occur in its absence.[8] 85 Fed. Reg. at 55295.

The final factor courts consider is the "degree of attenuation" between the regulated activity and a substantial effect on interstate commerce. *Ho*, 311 F.3d at 601. Here, as in *Groome*, *see* 234 F.3d at 215, the link is direct: a temporary moratorium on certain residential rental evictions directly affects economic relationships within the rental real estate market by temporarily precluding landlords from executing eviction orders for tenants' failure to fulfill a contractual obligation to pay rent. In contrast, in *Lopez*, the government urged the Court to find that firearm possession within a school zone had a substantial effect on interstate commerce because (1) the costs of violent crime are distributed throughout the population by insurance; (2) violent crime reduces the willingness of persons to travel to places they deem unsafe; and (3) guns in schools threaten the learning process, which in turn, "will result in a less productive citizenry." 514 U.S. at 563–64. Contrary to Plaintiffs' assertions, the direct link here between the regulated activity and a substantial effect on interstate commerce is categorically different from the attenuated chain of inferences required in *Lopez*. *See* Pls.' Mem. 19–21.

Nor are Plaintiffs correct that the Order exceeds the outer limits on the commerce power, such that it would provide the federal government with something akin to a general police power, regulating matters of traditional state concern like "family law and divorce." Pls.' Mem. 21. Notably, these are noncommercial activities, and the Supreme Court's primary concern in *Lopez* and *Morrison* was federal regulation of noneconomic activity (like localized crime) that had only an attenuated

---

[8] Plaintiffs' assertion that CDC did not make findings as to whether the Order is part of a broader regulatory scheme is irrelevant because, as demonstrated above, the Order regulates activity that is economic in nature. *See GDF Realty*, 326 F.3d at 638–39 (analyzing larger regulatory scheme of which regulated activity was part only after determining that the activity was not economic).

connection to interstate commerce. *See Morrison*, 529 U.S. at 615–18. In contrast, Congress's ability to regulate the national market for rental properties is already well-established. *See, e.g., Russell*, 471 U.S. at 862; *Groome*, 234 F.3d at 216. Thus, CDC's regulation of the national rental housing market to temporarily pause one remedy for the breach of a residential rental agreement—and in doing so, directly affect economic activity—does not in any way alter the "distinction between what is truly national and what is truly local." *Morrison*, 529 U.S. at 617–18. Plaintiffs have thus failed to demonstrate a likelihood of success on the merits of their Commerce Clause claim.

2. There Is No Basis to Conclude that the Order is Not "Proper."

Plaintiffs next argue that even if the Order is consistent with the authority provided under the Commerce Clause, the government must nonetheless show that the regulation was "proper." Pls.' Mem. 22–24. They cite *no* controlling precedent to support this contention, relying solely upon two Supreme Court concurrences in which no other Justices joined.[9] *See id.* And it is well established that "[t]he reasoning of a Supreme Court opinion that does not command a majority vote is not binding

---

[9] Plaintiffs assert that the Part of Chief Justice Roberts's opinion in *NFIB v. Sebelius*, 567 U.S. 519 (2012), addressing the Commerce and Necessary and Proper Clauses—in which no other Justice joined—should be applied here because four dissenters advanced the same reasoning. *See* Pls.' Mem. at 12 n.5. The Fifth Circuit recently made clear, however, that "any intimation that the views of dissenting Justices can be cobbled together with those of a concurring Justice to create a binding holding must be rejected." *Whole Woman's Health v. Paxton*, 972 F.3d 649, 653 (5th Cir. 2020). And at least two district courts within this Circuit have rejected the argument Plaintiffs advance here regarding the controlling nature of this Part of Chief Justice Roberts's *NFIB* opinion. *See Am. Stewards of Liberty*, 370 F. Supp. 3d at 734 (admonishing plaintiff for "repeatedly, but improperly, refer[ring] to a solo concurrence in *Sebelius* as the Court's holding" and declining to find "a concurring opinion in *Sebelius* to be persuasive authority"); *United States v. Spann*, No. 12-126, 2012 WL 4341799, at *3 (N.D. Tex. Sept. 24, 2012), *aff'd*, 562 F. App'x 237 (5th Cir. 2014) ("this court is not prepared to read the conglomeration of the dissenting opinions of four Justices combined with the opinion of Chief Justice John Roberts to constitute binding precedent" (cleaned up)). The fact that the Fifth Circuit has observed that Chief Justice Roberts and four dissenting Justices reached the same conclusion regarding the constitutionality of the Affordable Care Act's individual mandate under the Commerce and Necessary and Proper Clauses does not alter the fact that portions of the Chief Justice's opinion in which no other Justice joined are not the binding opinion of the Court. *See Texas v. United States*, 945 F.3d 355, 388 (5th Cir. 2019). To the contrary, the *Texas* opinion explicitly recognizes that "Parts of [the *NFIB*] opinion garnered a majority of votes and serve[] as the opinion of the Court." *Id.* at 387.

precedent." *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 178 (5th Cir. 2013). This Court is instead bound by the majority opinions in *Lopez, Morrison, Raich* and their progeny, and for the reasons explained at length above, those decisions show that Plaintiffs cannot meet their burden to show that no rational basis exists for concluding that the Order does not substantially affect interstate commerce.

Even if the Court were to separately consider Plaintiffs' argument that the Order is not "proper," however, it does no more than rehash their contentions that the Order improperly treads upon "matters of traditional state concern" without a limiting principle that would prevent the government from regulating activities like "[d]ivorce, local crime, [and] classroom curriculum in public schools." Pls.' Mem. 23–24. As Defendants have explained, however, the Order plainly regulates commercial activity, which requirement the Supreme Court has recognized can provide a "judicially enforceable outer limit[]" to the exercise of federal power. *See Lopez*, 514 U.S. at 566. Nor are Plaintiffs correct that there is a "lack of historical precedent" for this type of regulation of the rental housing market. Pls.' Mem. 23. As discussed above, both the Supreme Court and the Fifth Circuit have long recognized the validity of federal regulation of the market for residential rental properties. For these reasons, even if the Court were to consider this additional argument, Plaintiffs have not shown a likelihood of success on the merits.

### C. The Injunction Plaintiffs Seek Is Contrary to the Public Interest.

Finally, the balance of the harms overwhelmingly favors the government, and the injunction Plaintiffs seek is manifestly contrary to the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (observing that "[t]hese factors merge when the Government is the opposing party"). CDC issued the Order to prevent the spread of an easily transmissible, potentially serious, and sometimes fatal disease that has infected nearly ten million and killed over 235,000 persons within the United States. *See* 85 Fed. Reg. at 55292; *see also* CDC COVID Data Tracker. Indeed, as the *Brown* Court held,

> In evaluating whether the threatened injury of various state-mandated COVID-19 restrictions would outweigh the damage to the public's interest if they were

overturned, federal courts across the country have routinely concluded that undoing orders deemed necessary by public health officials and experts to contain a contagious and fast-spreading disease would result in comparatively more severe injury to the community.

2020 WL 6364310, at *22.

In balancing the equities and considering the public interest, courts have consistently refused to second guess the judgments of public health officials. *See, e.g., TJM 64, Inc. v. Harris*, No. 20-2398, 2020 WL 4352756, at *8 (W.D. Tenn. July 29, 2020) (refusing to enjoin local COVID-19 ordinance because such an injunction would "present a risk of serious public harm and foster the continued spread [of the] COVID-19 virus"); *Auracle Homes, LLC v. Lamont*, No. 20-829, 2020 WL 4558682, at *21 (D. Conn. Aug. 7, 2020) ("given the nature of this pandemic, the balance of the equities and the public interest favor denying a preliminary injunction"); *Tigges v. Northam*, No. 20-410, 2020 WL 4197610, at *10 (E.D. Va. July 21, 2020) ("The public interest in protecting human life—particularly in the face of a global and unpredictable pandemic—would not be served by enjoining state officials from taking executive action designed to slow the spread of COVID-19."); *Talleywhacker, Inc. v. Cooper*, No. 20-218, 2020 WL 3051207, at *14 (E.D.N.C. June 8, 2020) (finding that "the public interest does not weigh in favor of injunctive relief" where the government takes "intricate steps to craft reopening policies to balance the public health and economic issues associated with the COVID-19 pandemic," and "neither the court nor plaintiffs are better positioned to second-guess those determinations").

Plaintiffs, on the other hand, are acting in their individual economic interests. As demonstrated above, they have not shown that these interests will be irreparably harmed by the temporary restrictions in the Order. And even if they had, the public interest in protecting health outweighs even serious economic harm to individual plaintiffs. *TJM 64*, 2020 WL 4352756, at *7 (denying injunctive relief despite finding that plaintiffs would suffer "devastating economic injury" as a result of COVID-19 closure orders); *see also, e.g., League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (finding that "[t]hough Plaintiffs bear the very real risk

of losing their businesses, the Governor's interest in combatting COVID-19 is at least equally significant"); *Tigges*, 2020 WL 4197610, at *10 (finding that although plaintiff "suffered significant economic hardship due to the COVID-19 pandemic," that economic loss did not outweigh the "urgent need to act to protect . . . health and safety").

As the *Brown* court found in weighing arguments similar to those Plaintiffs advance here, any "economic harm pales in comparison to the significant loss of lives that Defendants have demonstrated could occur should the Court block the Order." 2020 WL 6364310, at *23. And although that court found that plaintiffs there were unlikely to succeed on their constitutional claims, it observed that "[e]ven if Plaintiffs did show a constitutional violation, the showing would not be enough to outweigh the public interest." *Id.*; *accord Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, No. 20-4844, 2020 WL 6120167, at *11 (E.D.N.Y. Oct. 16, 2020) (denying preliminary injunction where plaintiff was likely to suffer irreparable constitutional harm because "the balance of the equities[] cuts[] in favor of the State, which is trying to contain a deadly and highly contagious disease").

The balance of the harms and the public interest thus tilt decisively in favor of the government.

## II.    Any Relief Granted Should Be Narrowly Tailored.

Even if the Court were to disagree with Defendants' arguments, any relief should be no broader than necessary to provide Plaintiffs with relief and therefore should extend only to plaintiffs who have standing to sue.[10] "A plaintiff's remedy must be tailored to redress the plaintiff's particular

---

[10] In particular, the Court should deny a preliminary injunction as to Plaintiff Meadow Vista because it lacks standing. *See, e.g.*, *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (party must make clear showing of standing to obtain a preliminary injunction). By its terms, the Order applies only to "covered persons"—that is, those who submit a declaration to their landlords attesting that they qualify for its protections. Meadow Vista, however, does not suggest that any of its tenants have done that. *See* Decl. of Justin MacDonald ¶¶ 2–13 (failing to make such allegations); Pls.' Mem. 9–10 (same). Nor does it allege any specific, non-speculative reason to believe that its tenants will do so in the future. Because Meadow Vista cannot show that it has suffered or is at imminent risk of suffering injury caused by the Order and redressable by an order from this Court, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992), it fails to make the required standing showing.

injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Nationwide injunctions, in contrast, "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump. v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also, e.g.*, *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002) ("Allowing one circuit's statutory interpretation to foreclose . . . review of the question in another circuit" would "squelch the circuit disagreements that can lead to Supreme Court review."). The CDC Order at issue here has been challenged in at least four other districts, underscoring why this Court should not attempt to decide its legality for all parties and for all time. *See Brown*, No. 20-3702 (N.D. Ga.) (preliminary injunction denied Oct. 29, 2020); *KBW Inv. Props. v. Azar*, No. 20-1852 (S.D. Ohio) (federal defendants dismissed by stipulation after TRO denied); *Tiger Lily*, No. 20-2692 (W.D. Tenn.) (preliminary injunction denied Nov. 6, 2020); *Skyworks, Ltd. v. CDC*, No. 20-2407 (N.D. Ohio) (preliminary injunction motion pending).

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.

Dated: November 9, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC BECKENHAUER
Assistant Director, Federal Programs Branch

*/s/ Leslie Cooper Vigen*
LESLIE COOPER VIGEN
Trial Attorney (DC Bar No. 1019782)
STEVEN A. MYERS
Senior Trial Counsel (NY Bar No. 4823043)

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-0727
Fax: (202) 616-8470
E-mail: leslie.vigen@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify I served this document today by filing it using the Court's CM/ECF system, which will automatically notify all counsel of record.

Dated: November 9, 2020

/s/ *Leslie Cooper Vigen*
Trial Attorney