UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

———

No. 6:20-cv-00564

———

**Lauren Terkel et al.,**
*Plaintiffs,*

v.

**Centers for Disease Control and Prevention et al.,**
*Defendants.*

———

**OPINION AND ORDER**

This lawsuit presents the question whether the federal government has authority to order property owners not to evict specified tenants. Plaintiffs argue that this authority is not among the limited powers granted to the federal government in Article I of the Constitution, and thus the decision whether to enact an eviction moratorium rests with a given State. Disagreeing, the federal government argues that a nationwide eviction moratorium is within Article I's grant of federal authority to regulate commerce among the States.

Only that issue is posed here. This lawsuit does not question that the States may regulate residential evictions and foreclosures, as they have long done. For instance, during the Great Depression, 27 States enacted foreclosure moratoriums and other laws meant to mitigate the effects of a wave of foreclosures. Geoff Walsh, *The Finger in the Dike: State and Local Laws Combat the Foreclosure Tide*, 44 Suffolk U. L. Rev. 139, 139-43 (2011). In upholding one such law against a challenge not raised here, the Supreme Court recognized the "control which the state retains over remedial processes" in this area as part of the State's "police power, [which] is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people." *Home Bldg. Ass'n v. Blaisdell*, 290 U.S. 398, 434, 437 (1934).

But while "[t]he States have broad authority to enact legislation for the public good—what we have often called a 'police power'"—"[t]he Federal Government, by contrast, has no such authority[.]" *Bond v. United States*, 572 U.S. 844, 854 (2014). The question here is whether a nationwide moratorium on evicting specified tenants is within the limited powers that our Constitution grants to the federal government, namely, its authority to legislate as necessary and proper to regulate commerce among the several States.

The federal government cannot say that it has ever before invoked its power over interstate commerce to impose a residential eviction moratorium. It did not do so during the deadly Spanish Flu pandemic. Hr'g Tr. (Doc. 21) at 52:3-8 (government's representation). Nor did it invoke such a power during the exigencies of the Great Depression. *Id.* The federal government has not claimed such a power at any point during our Nation's history until last year. *Id.* at 55:9-17.

And the government's claim of constitutional authority is broad. The government admits that nothing about its constitutional argument turns on the current pandemic:

> THE COURT: [T]here's nothing special about COVID 19? Congress could do the same thing, the same temporary suspension of tenant evictions, if there was an inability to pay rent because of some other reason that Congress finds important? My example was cohabitating spouses sent to prison, but there could be others. That is your Commerce Clause argument; correct?
>
> MS. VIGEN: That is our Commerce Clause argument, correct.

Hr'g Tr. at 56:13-21. The federal government thus claims authority to suspend residential evictions for any reason, including an agency's views on "fairness." *Id.* at 53:11-23.

Given the open-textured nature of the relevant constitutional text, "the question of congressional power under the

- 2 -

Commerce Clause 'is necessarily one of degree.'" *United States v. Lopez*, 514 U.S. 549, 566 (1995) (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). Reasonable minds may differ given the lack of "precise formulations." *Id.* at 567. But here, after analyzing the relevant precedents, the court concludes that the federal government's Article I power to regulate interstate commerce and enact laws necessary and proper to that end does not include the power to impose the challenged eviction moratorium.

## Background

**1.** COVID-19 is a disease "caused by a new coronavirus first identified in Wuhan, China, in December 2019." *See* Centers for Disease Control and Prevention, *About COVID-19* (Sept. 1, 2020), www.cdc.gov/coronavirus/2019-ncov/cdcresponse/about-COVID-19.html. "Although most people who have COVID-19 have mild symptoms, COVID-19 can also cause severe illness and even death." *Id.* The disease "is thought to spread mainly through close contact from person to person." *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads* (Oct. 28, 2020), www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html. The public and private response to COVID-19 has led to business disruptions for many.

On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security Act. Pub. L. No. 116-136, 134 Stat. 281 (2020) (the CARES Act). Among other things, the Act included a 120-day prohibition on the initiation of eviction proceedings for "covered properties," defined as those participating in specified federal programs or with specified federally backed loans. *Id.* § 4024, 134 Stat. at 492-93. Congress did not renew the CARES Act, and the Act's eviction moratorium lapsed on July 27, 2020. A number of States, however, have eviction moratoria or rent-assistance programs of their own. As noted, this lawsuit does not call into question state and local-government measures.

In September 2020, the Centers for Disease Control and Prevention—a component of the U.S. Department of Health and Human Services—issued the agency order challenged here. Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020). The order was originally set to expire on December 31, 2020. *Id.* at 55,297. Federal legislation then extended the order's expiration date to January 31, 2021. Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 502, 134 Stat. 1182, 2078-79 (2020). A subsequent agency order further extended the eviction moratorium, with minor modifications and additional findings, to be effective through the end of March 2021. Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 8,020, 8,021 (Feb. 3, 2021) ("This Order further extends and modifies the prior Orders until March 31, 2021[.]"). No party argues that supplemental pleading is necessary to give fair notice of plaintiffs' continuing challenge to the order as extended, which the government agrees "is identical in substance and effect" to the original order. Doc. 42 at 2; *accord* Doc. 43 at 2.

The CDC order generally makes it a crime for a landlord or property owner to evict a "covered person" from a residence. 86 Fed. Reg. at 8,020. A "covered person" is any resident who provides the landlord or property owner with a declaration that makes five certifications, namely:

(1) the resident has used best efforts to obtain available government assistance for rent or housing;

(2) the resident falls below certain income thresholds, generally $99,000 annually or $198,000 annually if filing a joint tax return;

(3) the resident is unable to pay the full rent due to "substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses";

- 4 -

    (4) the resident is using best efforts to make timely partial payments that are as close to the full payment as circumstances permit; and

    (5) the resident has no other available space for occupancy at the same or less housing cost and, if evicted, would either need to live without housing or move into a congregate or shared-living setting.

*Id.* at 8,020-8,021.

The order prohibits any action to remove or cause the removal of a covered person from a residential property. *Id.* The order allows evictions, however, if a resident is (1) engaging in criminal activity on the premises; (2) threatening the health and safety of other residents; (3) damaging or posing an immediate and significant risk of damage to property; (4) violating any applicable building code, health ordinance, or similar regulation relating to health and safety; or (5) violating any other contractual obligation, other than timely payment of rent or similar fees. *Id.* at 8,022.

A person who engages in a prohibited eviction is subject to a criminal penalty of up to one year of imprisonment, to be followed by up to one year of supervised release, and a fine of up to $250,000. 42 U.S.C. § 271; 18 U.S.C. §§ 3559(a)(6), 3583(b)(3); 42 C.F.R. § 70.18; *see* 86 Fed. Reg. at 8,025 (citing criminal provisions). An organization that engages in a prohibited eviction is subject to a criminal penalty of a fine of up to $500,000. 42 C.F.R. § 70.18; *see* 86 Fed. Reg. at 8,025. The order applies in any State that does not offer "the same or greater" protections than does the order. *Id.* at 8,021.

The order pauses only evictions, not financial obligations. *Id.* at 8,021-8,022 ("This Order does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other obligation that the individual may have under a tenancy, lease, or similar contract."). Thus, a person whose eviction is barred still incurs liability for rent while inhabiting the property. *See* Centers for Disease Control and

- 5 -

Prevention, *Frequently Asked Questions* at 3, www.cdc.gov/
coronavirus/2019-ncov/downloads/eviction-moratoria-order-
faqs.pdf ("Covered people still owe rent to their landlords.").

2. Plaintiffs Lauren Terkel; Lufkin Creekside Apartments,
Ltd.; Lufkin Creekside Apartments II, Ltd.; Lakeridge Apart-
ments, Ltd.; and MacDonald Property Management, LLC
own or manage residential properties and seek to evict some
residents there for nonpayment of rent. Doc. 3 at 45-46, 49-52,
54-56, 57-60. They are prohibited from doing so by the CDC
order, *id.*, and they challenge that order as exceeding the fed-
eral government's constitutional authority, Doc. 1.

The remaining two plaintiffs, Pineywoods Arcadia Home
Team, Ltd. and Weatherford Meadow Vista Apartments, LP,
have not submitted declarations that residents of their prop-
erties claim "covered person" status under the CDC order. *See*
Doc. 3 at 50-51 ¶¶ 1-17 (representing that at least one Piney-
woods tenant is delinquent on rent but not representing that
any such tenant has presented a declaration pursuant to the
CDC order); Doc. 3 at 58-59 ¶¶ 1-13 (not representing that any
Weatherford tenant has presented a declaration pursuant to
the CDC order). Nor does the complaint allege with particu-
larity that any tenant at Pineywoods or Weatherford has pre-
sented a declaration that is preventing an eviction. *See* Doc. 1
at 9 ¶¶ 34-36, 12-13 ¶ 67. As those two plaintiffs joined in the
request for final judgment on the current record, Hr'g Tr. at
81:9-19, their claims are now dismissed without prejudice for
lack of standing. *See* Fed. R. Civ. P. 12(h)(3) ("If the court de-
termines at any time that it lacks subject-matter jurisdiction,
the court must dismiss the action.").

Defendants are the United States, CDC, HHS, and three
HHS officials responsible for the order. Doc. 1 at 4-5; Doc. 26.
Against those defendants, plaintiffs seek a declaration that the
order exceeds the government's constitutional authority. Doc.
1 at 17-18 (citing 28 U.S.C. § 2201 and 5 U.S.C. § 706). Plaintiffs
also seek a permanent injunction setting aside the order as

contrary to constitutional authority and barring the order's enforcement. *Id.* (citing 5 U.S.C. § 706).

Plaintiffs moved for a preliminary injunction and provided argument on the merits of their case and the equities of injunctive relief. Doc. 3. Defendants opposed that motion and provided their views on the merits and injunctive relief. Doc. 11. The court then heard extensive oral argument from both parties. Hr'g Tr. 1-86.

Plaintiffs asked that, given the purely legal nature of the merits question and the likely efficacy of declaratory relief, the court proceed to consideration of summary judgment rather than preliminary relief. *Id.* at 80:10-81:19. The government requested an opportunity to file the administrative record and additional merits briefing, as some of the space spent briefing plaintiffs' motion for preliminary relief had been devoted to the equities and not the merits. *Id.* at 78:16-22, 82:19-20. The court accepted both requests. It gave notice, pursuant to Federal Rule of Civil Procedure 56(f), that it would consider summary judgment. Doc. 18. And it allowed submission of the original and supplemental administrative records and 45 more pages of briefing per side. Docs. 18, 26, 41. The court has now considered the administrative record and all briefing.

### Analysis

Summary judgment is appropriate when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Here, plaintiffs' merits case presents a pure question of law. The only relevant facts are judicially noticeable or legislative facts such as congressional findings, as opposed to adjudicative facts to be resolved in this case. *See* Doc. 18; *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009) ("[A] facial challenge to the constitutionality of a statute presents a pure

question of law."). The government thus agrees that discovery is not necessary in this case. Hr'g Tr. at 82:16.

Because no material factual dispute exists, the issue becomes whether plaintiffs are entitled to judgment as a matter of law. The government does not defend the order as an exercise of the "executive Power" granted to the President in Article II of the Constitution. So plaintiffs' entitlement to judgment as a matter of law on their constitutional claim turns on whether the order is within the "legislative Powers" granted to Congress in Article I of the Constitution, which could be delegated to an agency. Specifically, the government defends the order under the Commerce Clause and, in the alternative in response to plaintiffs, the Necessary and Proper Clause of Article I. Doc. 11 at 14-26 & n.4.

The Supreme Court has held that the commerce power allows regulation of three categories of activity: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and (3) "those activities having a substantial relation to interstate commerce, . . . i.e., those activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59. The parties agree that, if the order is authorized, it is under the third category, referred to as the substantial-effects test. *See* Doc. 11 at 15-16; Doc. 13 at 3.

In considering whether the substantial-effects test is met, the Supreme Court has "undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." *Lopez*, 514 U.S. at 557. That standard respects Congress's ability to gather facts and assess regulatory effectiveness. *See id.* at 562-63 (allowing that Congress may find a substantial effect on interstate commerce "even though no such substantial effect was visible to the naked eye"); *accord Gonzales v. Raich*, 545 U.S. 1, 22 (2005) (asking whether a rational basis exists for concluding that local cultivation and use of marijuana, taken in the aggregate,

substantially affects interstate commerce "in fact"). At the same time, a court presented with a Commerce Clause challenge must make an "independent evaluation" of the legal effect of such facts and findings. *Lopez*, 514 U.S. at 562; *cf. United States v. Morrison*, 529 U.S. 598, 616 (2000) ("Under our written Constitution, however, the limitation of congressional authority is not solely a matter of legislative grace."); *United States v. Bass*, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.").

As described by the Supreme Court in *Morrison*, the reach of Congress's power to regulate based on a local activity's substantial effect on interstate commerce turns on at least four "significant considerations": (1) the economic character of the intrastate activity; (2) whether the regulation contains a "jurisdictional element" that may "establish whether the enactment is in pursuance of Congress' regulation of interstate commerce"; (3) any congressional findings regarding the effect of the regulated activity on commerce among the States; and (4) attenuation in the link between the regulated intrastate activity and commerce among the States. 529 U.S. at 609-13. Those considerations are discussed below in turn.

**1.** Discerning how a local activity may have an "economic" character requires understanding the nature of the substantial-effects test that poses that question. The substantial-effects test rests on the insight that regulation of local activity may be necessary to effectuate a broader regulation of interstate commerce. Courts examine the extent to which a local activity is economic in nature to help gauge whether regulation of that local activity is an "appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce." *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942).

The parties dispute whether the substantial-effects test should be viewed "through the lens of the Necessary and

Proper Clause." Doc. 11 at 15 n.4. The government argues that it should not be. But ignoring the Necessary and Proper Clause would disregard the origins of the substantial-effects test and thereby diminish the fidelity of its application. The Supreme Court has repeatedly grounded the substantial-effects test in the Necessary and Proper Clause. Both *Lopez* and *Morrison* traced that test to *Wickard v. Filburn*, 317 U.S. 111 (1942). *Lopez*, 514 U.S. at 556; *Morrison*, 529 U.S. at 610. *Wickard*, in turn, cited Necessary and Proper Clause precedent as justifying the substantial-effects test. *Wickard*, 317 U.S. at 129 (citing the famous Necessary and Proper Clause discussion in *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)).

*Wickard* also cited, *id.* at 124, the Court's earlier decision in *Wrightwood Dairy*, which upheld federal price regulations on milk produced and sold intrastate, 315 U.S. at 115-16, 125. And *Wrightwood Dairy* also relies on *M'Culloch*'s explication of the Necessary and Proper Clause. *Id.* at 119 (permitting Congress to regulate intrastate activities whose character would "make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce") (citing *M'Culloch*, 17 U.S. at 421 ("Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.")).

More recently, *Gonzales v. Raich* grounded the substantial-effects test in the Necessary and Proper Clause. 545 U.S. at 2. *Raich* upheld, under the "substantially affect" test, federal regulation of the local cultivation and use of marijuana. *Id.* at 22. The Court reasoned that such legislation is within Congress's "authority to 'make all Laws which shall be necessary and proper' to 'regulate Commerce . . . among the several States.'" *Id.* (quoting U.S. Const. art. I, § 8). Unsurprisingly, *United States v. Comstock* referred to *Lopez*, *Morrison*, and *Raich* as

Necessary and Proper Clause cases. *Comstock*, 560 U.S. 126, 134-35, 148 (2010); *accord United States v. Whaley*, 577 F.3d 254, 258, 260 (5th Cir. 2009).

As those precedents show, the substantial-effects test does not examine the economic character of a regulated activity as an abstract exercise. The point is to assess the nexus between the local activity and interstate commerce or federal regulation thereof. For instance, in concluding that a law restricting firearm possession did not regulate economic activity, *Lopez* reasoned that the restriction "[was] not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." 514 U.S. at 561. In contrast, the law in *Wickard* "involved economic activity in a way that the possession of a gun in a school zone does not." *Id.* at 560. Specifically, the law in *Wickard* "was designed to regulate the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and shortages, and concomitant fluctuation in wheat prices," which would be influenced by any consumption of wheat, a fungible commodity. *Id.*

Here, the regulated activity is not the production or use of a commodity that is traded in an interstate market. Rather, the challenged order regulates property rights in buildings—specifically, whether an owner may regain possession of property from an inhabitant. 86 Fed. Reg. at 8,021 (defining "eviction" as any action "to remove or cause the removal of a covered person from a residential property"). Real estate is inherently local. Residential buildings do not move across state lines. And eviction is fundamentally the vindication of the property owner's possessory interest. *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 920 (Tex. 2013) ("[E]viction is allowed only if the tenant has no remaining legal or possessory interest."). Indeed, the challenged order disclaims any effect on the parties' financial relationship: "Nothing in this Order precludes the charging or collecting of fees,

- 11 -

penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract." 86 Fed. Reg. at 8,022. The order's disclaimer of any change in financial obligations provides little support for characterizing the order as economic.

The law at issue in *Lopez* criminalized the possession of one's handgun when in a covered area. 514 U.S. at 551. The order at issue here criminalizes the possession of one's property when inhabited by a covered person. 86 Fed. Reg. at 8,020. Neither regulated activity is economic in material respect. Although public health and safety are important goals on which the government may act pursuant to its commerce power, neither alone makes a law economic in character.

To be sure, the market for rental housing consists of economic relationships between landlords and tenants. But courts applying the substantial-effects test must look "only to the expressly regulated activity" itself. *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 634 (5th Cir. 2003). Here, that is only eviction. As noted, the challenged order does not change a landlord's or tenant's financial obligations. In regulating only recourse to a remedy under state law, the order is unlike the regulation in *Groome Resources Ltd. v. Parish of Jefferson*, 234 F.3d 192 (5th Cir. 2000), which addressed conduct that "directly interfere[d] with a commercial transaction." *Id.* at 206. And although a person's residence in a property may have a commercial origin, that alone is not enough to make the regulated activity itself economic in character. *See GDF Realty*, 326 F.3d at 634-35 ("[L]ooking primarily beyond the regulated activity in such a manner would 'effectually obliterate' the limiting purpose of the Commerce Clause.").

Whether evictions themselves are economic in nature for the sake of constitutional analysis is not decided in any of the government's cited cases. Two of those cases, *Russell v. United States* and *Jones v. United States*, decided whether an apartment building "affect[ed] commerce" within the meaning of

a statute. *Russell v. United States*, 471 U.S. 858, 859 (1985); *Jones v. United States*, 529 U.S. 848, 850-51 (2000). The meaning of an act of Congress is not the same question as the scope of power granted by the Constitution. Moreover, that a building's use may "affect" commerce and thus fall within the terms of a statute does not mean that every interaction dealing with the building "substantially" affects interstate commerce or is economic in character for purposes of constitutional analysis. *See United States v. Corona*, 108 F.3d 565, 569 (5th Cir. 1997), *as modified on denial of reh'g* (Apr. 7, 1997) ("By inserting the word 'substantially' in its formulation of the 'effects test,' the Court reminded us that federal courts have a duty to scrutinize the Congress's commerce power and dispelled the notion that *de minimis* connections to interstate commerce can legitimate federal legislative powers.").

**2.** Second, the court considers whether the challenged order has a "jurisdictional element" that "may establish that the enactment is in pursuance of Congress' regulation of interstate commerce." *Morrison*, 529 U.S. at 612; *accord M'Culloch*, 17 U.S. at 421 (focusing, under the Necessary and Proper Clause, on "the end" pursued by a law). A jurisdictional element of a federal crime, for instance, might limit the crime to instances where certain materials are "transported in interstate or foreign commerce." *E.g.*, *United States v. Kallestad*, 236 F.3d 225, 228-29 (5th Cir. 2000). A jurisdictional element alone, however, is insufficient to deem a regulation constitutional. *Id.* at 229; *accord United States v. Ho*, 311 F.3d 589, 600 (5th Cir. 2002) ("Congress may not add the words 'interstate commerce' to every statute and expect the courts meekly to comply.").

The government admits that the CDC order "does not limit its application based on a connection to interstate commerce." Doc. 11 at 24. Accordingly, the order has no jurisdictional element. The government misunderstands the inquiry in arguing that a jurisdictional element is present because the

- 13 -

order was issued under the HHS Secretary's statutory authority to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or *from one State or possession into any other State or possession*." *Id.* (quoting 42 U.S.C. § 264(a) and similar language in 42 C.F.R. § 70.2). A jurisdictional element for purposes of constitutional analysis is one that "ensure[s], through case-by-case inquiry," that all applications of a regulation "have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 561-62. The government's cited authority does not impose such a case-by-case limitation.

**3.** *Morrison* held that the existence of "formal findings as to the substantial burdens that an activity has on interstate commerce" may allow a court to find satisfactory evidence of a substantial effect on interstate commerce even if not immediately apparent. 529 U.S. at 612; *accord Ho*, 311 F.3d at 600 (noting that such findings can be "helpful," even if not dispositive). As to regulation of noneconomic, intrastate activity, helpful findings would demonstrate that the regulation is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561. Whether such findings show that an intrastate activity is within Congress's regulatory power "is ultimately a judicial rather than a legislative question." *Morrison*, 529 U.S. at 614 (quoting *Lopez*, 514 U.S. at 557 n.2).

Here, neither Congress nor the agency made findings that a broader regulation of commerce among the States would be undercut without the order. *See* § 502, 134 Stat. at 2078-79; 85 Fed. Reg. at 55,292-55,297; 86 Fed. Reg. at 8,020-8,025. The fact that an activity has some ultimate tie or correlation to national-employment or socio-economic statistics, as noted in the administrative record here, is not enough of a nexus under the constitutional test. *E.g.*, Doc. 44-4 at 18 (finding that

- 14 -

homelessness may strain healthcare systems). A great many things in this country are connected in some way. But *Morrison* rejected the sufficiency of observations of that nature. 529 U.S. at 612 (finding inadequate the government's argument that local, noneconomic activity "can be expected to affect the functioning of the national economy" by creating costs that are spread throughout the population and threaten the productivity of the workforce).

At times, the government's briefing points to the agency's findings about public-health benefits of the order. *See, e.g.*, 85 Fed. Reg. at 55,294 ("[H]ousing stability helps protect public health because homelessness increases the likelihood of individuals moving into close quarters in congregate settings, such as homeless shelters, which then puts individuals at higher risk to COVID-19."). Those findings may or may not help show statutory authority for the order under 42 U.S.C. § 264(a). But they are findings about public health, a quintessential concern of the police power. They are not findings explaining how a broader federal regulation of commerce among the States is undercut without the order. *Cf. GDF Realty*, 326 F.3d at 639 ("[N]on-commercial, intrastate activities must be 'essential' to an *economic* regulatory scheme's efficacy . . . ."). So this case again stands in contrast to *Groome Resources*, where the court noted extensive congressional findings tying discrimination in housing to burdens on interstate commerce. 234 F.3d at 212-14.

**4.**   The substantial-effects test also examines the extent of attenuation between interstate commerce and the regulated activity. *Morrison*, 529 U.S. at 612. Here, the relationship between interstate commerce and an eviction criminalized by the order is attenuated in several dimensions.

First, the eviction of one person from a dwelling does not alone have a self-evident substantial effect on interstate commerce, and the government has not pointed to any findings demonstrating such a substantial effect. *See supra* pp. 13-15.

- 15 -

Because evictions are not themselves economic activity, their effects cannot be aggregated under the *Wickard* principle. *See supra* pp. 9-12.

Second, the eviction moratorium is not a backstop in a larger regulation of commerce. *See Lopez*, 514 U.S. at 561. In comparison, a law barring landlords from refusing to lease property for a prohibited reason could likewise bar landlords from evicting tenants for the same prohibited reason, lest the equal-leasing rule be readily undermined. *Cf.* 42 U.S.C. § 3604; *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982). The CDC order, in contrast, is not part of a broader federal regulation of the landlord-lessee relationship. No federal law requires that a landlord *give* possession of a dwelling in the first instance to a person who cannot pay rent and who would otherwise live in congregate housing. The federal order against *evicting* such persons is thus not supportable as a backstop to avoid undercutting such a broader regulation.

Third, even though quarantining an infected person from new contacts would keep the person from traveling interstate (or anywhere else), the CDC order is not such a quarantine. The order applies without regard to a tenant's infection with, prior exposure to, or vaccination against COVID-19. It applies without regard to whether an evicted tenant would move to a new city, much less a new State.

Fourth, the attenuation analysis must preserve "the distinction between what is national and what is local in the activities of commerce." *Lopez*, 514 U.S. at 567; *see NFIB v. Sebelius*, 567 U.S. 519, 560 (2012) (Roberts, C.J., concurring) (concluding that "an expansion of federal power" into traditional matters of state concern was "not a 'proper' means for" federal insurance reforms). The attenuation here threatens that distinction, as to both the challenged order itself and "the implications of the Government's arguments." *Lopez*, 514 U.S. at 564.

- 16 -

The order itself criminalizes the use of state legal proceedings to vindicate property rights. That scope alone treads into an area of traditional state concern: remedies protecting property rights. In upholding state regulation in this field against a different challenge, the Supreme Court observed that such regulation is part of the "police power, . . . an exercise of the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people." *Home Bldg. Ass'n*, 290 U.S. at 437; *accord, e.g., E. N.Y. Sav. Bank v. Hahn*, 326 U.S. 230, 233 (1945) (upholding a state moratorium on mortgage foreclosures as within "the reserve power of a State"). Unsurprisingly, then, the federal government has never before invoked its commerce power to impose a nationwide eviction moratorium. Hr'g Tr. at 52:3-7, 55:9-14 (government's admission). Nor has the court's attention been called to a longstanding analogous use of federal power.

Although not cited by the parties, one possible contender might be the rent-control provisions of the Emergency Price Control Act of 1942, which the Supreme Court considered in *Bowles v. Willingham*, 321 U.S. 503 (1944). But unlike the order here, that Act addressed commercial relations by regulating rental prices and, being applicable only in "defense areas," was premised on Congress's powers regarding the military. *Id.* at 506-08. *See generally United States v. Kebodeaux*, 570 U.S. 387, 403 (2013) (Roberts, C.J., concurring) (noting that a challenged law's "connection to the Military Regulation Clause . . . is less attenuated, and the power it produces less substantial, than would be true of a federal police power").

The absence of an historical analog here calls to mind the Supreme Court's instruction that "[p]erhaps the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010) (cleaned up). Similarly, the Necessary and Proper Clause inquiry asks whether a challenged law is "a modest addition to a set of federal . . . statutes that have

- 17 -

existed for many decades" or "reasonably extended [a] longstanding [] system." *Comstock*, 560 U.S. at 137, 142. Here, no historical practice of analogous federal regulation has been cited. *See generally Corona*, 108 F.3d at 569 (asking whether, like "the statute in *Lopez*, [the challenged law] imposes a criminal penalty in an area that has been the domain of state jurisprudence throughout our history"). Indeed, the CDC's eviction moratorium goes beyond the CARES Act's moratorium responding to the same COVID-19 pandemic, which was limited to dwellings that received federal funding. *See* 15 U.S.C. § 9058(2).

As to the broader implications of the government's arguments, they too suggest a breakdown in the demarcation of traditional areas of state concern. While valid federal law is of course supreme, a court assessing a law's validity under the Commerce Clause may not "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567.

That sort of inference has been offered here. For instance, the government's briefing argued that evictions covered by the CDC order may be rationally viewed as substantially affecting interstate commerce because 15% of changes in residence each year are between States. Doc. 11 at 19 (citing 85 Fed. Reg. at 55,295). Of course, people change residences for many reasons other than eviction. So that statistic does not readily bear on the effects of the eviction moratorium here. More fundamentally, that statistic does not show a meaningful link between the eviction moratorium and a broader federal regulation of interstate commerce. The focus of the challenged order is people moving into congregate housing, irrespective of whether those moves are between or within States. The incidental fact that some moves are between States, while the bulk are not, does not show that the order is an "appropriate means to the attainment of a legitimate end, the

- 18 -

effective execution of the granted power to regulate interstate commerce." *Wrightwood Dairy*, 315 U.S. at 119.

If statistics like that were enough, Congress could also justify national marriage and divorce laws, as similar incidental effects on interstate commerce exist in that field. The same census data cited by the government here show that changes in marital status result in almost ten times more residential moves than do evictions and foreclosures. U.S. Census Bureau, *CPS Historical Migration/Geographic Mobility Tables*, Table A-5, cells C9, P9 (Dec. 2020), *available at* www.census.gov/data/tables/time-series/demo/geographic-mobility/historic.html (showing, for the most recent study period, 1,827,000 moves because of a change in marital status compared to 190,000 moves because of eviction or foreclosure); *see* 86 Fed. Reg. at 8,023 n.24 (citing same mobility tables).

In other words, the government's cited data show almost ten times more changes in residence—the same 15% of which the government says cross state lines—from marriage and divorce than from eviction and foreclosure. So the government's argument about predicted effects on interstate travel would support federal regulation of marriage and divorce even more strongly than it supports the eviction moratorium here. But the Supreme Court has found a link between local activity and interstate commerce too attenuated when the same link "may . . . be applied equally as well to family law and other areas of traditional state regulation." *Morrison*, 529 U.S. at 615.

Finally, the government concedes that its view of constitutional authority would allow a federal eviction moratorium for any reason, including views on "fairness." Hr'g Tr. at 56:11-21, 55:18-25. The government's argument would thus allow a nationwide eviction moratorium long after the COVID-19 pandemic ends. The eviction remedy could be suspended at any time based on fairness as perceived by Congress or perhaps an agency official delegated that judgment. Such broad

authority over state remedies begins to resemble, in opera-
tion, a prohibited federal police power.

As Justice Kennedy explained in his *Lopez* concurrence:
"In a sense any conduct in this interdependent world of ours
has an ultimate commercial origin or consequence, but we
have not yet said the commerce power may reach so far." 514
U.S. at 580, *quoted in Morrison*, 529 U.S. at 611. The court
reaches a similar conclusion here. The considerations dis-
cussed in the governing cases point to the same conclusion:
the CDC order exceeds the power granted to the federal gov-
ernment to "regulate Commerce . . . among the several States"
and to "make all Laws which shall be necessary and proper
for carrying into Execution" that power. U.S. Const. art. I, § 8.
The challenged order is therefore held unlawful as "contrary
to constitutional . . . power." 5 U.S.C. § 706(2)(B).

## Conclusion

Because the remaining plaintiffs are entitled to judgment
as a matter of law, the court enters summary judgment grant-
ing declaratory relief in their favor. Although the COVID-19
pandemic persists, so does the Constitution. Declaring the
scope of constitutional power is thus proper relief, and a fed-
eral court with jurisdiction has a "virtually unflagging obliga-
tion . . . to exercise that authority" to resolve a case before it.
*Mata v. Lynch*, 576 U.S. 143, 150 (2015) (quoting *Colo. River Wa-
ter Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976))
(cleaned up).

Given defendants' representations to the court, Hr'g Tr. at
77:8-12, it is "anticipated that [defendants] would respect the
declaratory judgment." *Poe v. Gerstein*, 417 U.S. 281, 281
(1974). So the court chooses not to issue an injunction at this
time. *See Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985).
Plaintiffs may, of course, seek an injunction should defend-
ants threaten to depart from the declaratory judgment. *See* 28
U.S.C. § 2202; *Powell v. McCormack*, 395 U.S. 486, 499 (1969).

- 20 -

Any pending motion is denied without prejudice as moot. Final judgment will issue forthwith.

*So ordered by the court on February 25, 2021.*

J. CAMPBELL BARKER
United States District Judge